390 So.2d 338 (1980)
Charles Willis MALONE, Jr., Appellant,
v.
STATE of Florida, Appellee.
Nos. 54024, 54025.
Supreme Court of Florida.
September 25, 1980.
Rehearing Denied December 8, 1980.
Jack O. Johnson, Public Defender, and Wayne Chalu and Samuel Robert Mandelbaum, Asst. Public Defenders, Tampa, for appellant.
Jim Smith, Atty. Gen., and C. Marie King, Asst. Atty. Gen., Tampa, for appellee.
ALDERMAN, Justice.
Charles Willis Malone, Jr. appeals his convictions for the first-degree murders of Manuel Tanner and Jessee Woodward and his sentences of death. He also appeals his conviction and sentence for robbery. We reverse.
On July 14, 1977, Jessee Woodward appeared at the residence in St. Petersburg, Florida, where Malone and his friend and co-perpetrator, Freddie Lee Morris, were staying. Three days earlier, Malone and Morris had attempted to commit a robbery and kidnapping. They suspected that Woodward was a detective investigating those crimes, but, in fact, he was not. At gunpoint, they searched Woodward and took two dollars and a wallet from him. Then, using Woodward's automobile, they forced him to accompany them on a forty-mile trip to a remote, deserted location on the outskirts of Tampa. During this trip, Woodward pleaded for his life. When they arrived, Malone took Woodward away from the automobile into a marshy, wooded area and shot him twice in the back of his head. Then, after visiting some friends in Tampa, Malone and Morris drove around in Woodward's automobile looking for a place to rob. They finally selected a Tampa service station and, at gunpoint, robbed the attendant, Manuel Tanner, taking fifty to sixty dollars and two hundred to three hundred packs of cigarettes. During the robbery, Malone beat Tanner to death with a blunt, pipe-like instrument. As a result of being *339 struck on the head approximately ten times, Tanner sustained severe skull fractures, numerous fractures on the right side of his scalp and on the base of his skull, and ten lacerations on his scalp. The police later found Woodward's car parked in an apartment area in Tampa. From several items of physical evidence found in the automobile, including Malone's fingerprints, the police were able to connect Malone with Woodward's automobile and with the service station robbery.
Malone was convicted for the premeditated, first-degree murders of Jessee Woodward and Manuel Tanner and the robbery of the service station. The jury recommended death sentences. The trial court sentenced Malone to death for each of the murders and to life imprisonment for the robbery.
Malone argues that his convictions should be reversed and the cause remanded for a new trial because the trial court erred in denying his motion to suppress certain incriminating statements made by him to one of his cellmates who, unknown to Malone, was an informer for the State. He concedes that these statements were not coerced and were voluntary, but argues that they may not be used against him because they were deliberately elicited by a State agent in the absence of his counsel and without his being informed of his Miranda rights by the informant.
The informer, who was also a prisoner, first met Malone in the Pinellas County jail in September, 1977. Two and one-half weeks after meeting Malone, the informer met Detective Hazzard who asked him to assist in finding the body of Jessee Woodward by just listening to whatever Malone said about the case and reporting anything he heard about where the body was located. The informer testified that he did not ask Malone where the body was or in any way interrogate him, but he did suggest a plan to the police by which he might be able to obtain information from Malone as to where Woodward's body was hidden. The plan was to have the informer transferred to another county jail and then to have him come back and visit Malone in civilian clothes. Prior to being transferred, the informer went back to his cell and told Malone that he was being released and assured Malone that he knew a black female attorney whom he would try to retain for Malone. Under the misimpression that the informer would be able to assist him on the outside, Malone then told the informer that he had killed Woodward, that there were several things he wanted the informer to do for him, and that he would tell the informer about them when he returned on visitation day. Some time later, dressed in civilian clothes, the informer returned to the jail, as requested by Malone. Anxious to ensure that he would not be linked with Woodward's body, Malone gave the informer directions to where the body was located and instructed the informer to dispose of the remains. From the directions given by Malone, the police were unable to find the body. Pursuant to police directions, the informer returned to the jail and told Malone that he was unable to locate the body from the previous directions. Malone then gave more detailed directions, but the police were still unable to find the body. The codefendant, Freddie Morris, ultimately led the police to the body, which was located in the area described by Malone in his directions to the informer.
In light of the recent pronouncement of the Supreme Court of the United States in United States v. Henry, ___ U.S. ___, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), we hold that Malone's incriminating statements made to the State informant while in custody in the Pinellas County jail should have been suppressed because these statements made in the absence of counsel, with no prior waiver of counsel, were directly elicited by the State's stratagem deliberately designed to elicit an incriminating statement from Malone. Therefore, the introduction of these statements violated Malone's sixth amendment right to the assistance of counsel. Detective Carpenter testified that on several occasions he had advised Malone of his Miranda rights and had attempted to interview Malone regarding the Tanner and Woodward murders but *340 that Malone had refused to be interviewed. It was thereafter that the ruse of the cellmate being released was concocted and employed to derive information from Malone as to the whereabouts of Woodward's body.
In United States v. Henry, the Supreme Court held that Henry's statements to a paid police informant-cellmate were improperly admitted at trial because the government violated Henry's sixth amendment right to counsel by intentionally creating a situation likely to induce Henry to make incriminating statements without assistance of counsel. Federal agents had instructed the informant to be alert to any statements made by the federal prisoners regarding charges against them but had specifically directed him not to question Henry or the other prisoners about their charges. Distinguishing the situation before it from one where the "listening post" is an inanimate listening device having no capability of leading the conversation into a particular subject or prompting a reply and from the situation where an informant is placed in close proximity but makes no effort to stimulate conversations about the crime charged, the Supreme Court held that the government agent in Henry was not a passive listener but had had conversations with Henry while Henry was in jail. The Court determined that Henry's incriminating statements were the product of these conversations and explained that, from the fact that the informer was paid by the government on a contingent fee basis for incriminating information, it could be assumed that he would take some affirmative steps to secure this information. Where the accused is in the company of a fellow cellmate who unbeknownst to him is acting as an informer, the Court declared, the conversation stimulated may elicit information which the accused would not intentionally reveal to a government agent. The Court reiterated its previous pronouncement made in Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), that to have any effect, the sixth amendment must apply to indirect surreptitious interrogations. It further explained that since Henry was unaware that he was talking to a government agent, he could not be held to have waived his right to counsel. Finally, it emphasized the relevancy to its holding of the fact that at the time Henry was engaged in conversation by the government agent, he was incarcerated, and the Court stated:
While the concern in Miranda was limited to custodial police interrogation, the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover government agents. The Court of Appeals determined that on this record the incriminating conversations between Henry and Nichols were facilitated by Nichols' conduct and apparent status as a person sharing a common plight. That Nichols had managed to gain the confidence of Henry, as the Court of Appeals determined, is confirmed by Henry's request that Nichols assist him in his escape plans when Nichols was released from confinement.
100 S.Ct. at 2188.
In the present case, the subterfuge employed by the informer and condoned and participated in by the State precipitated the incriminating statements made by Malone. During the at least month-long period of time preceding the informer-cellmate's "release," Malone had not told the informer that he had committed the murder, nor had he ever mentioned the location of Woodward's body. Not until after being informed by the cellmate of the cellmate's impending release, did Malone confess to him that he had killed Woodward and disclose the whereabouts of the victim's body. Because of Malone's confidence which the informant had managed to gain and because Malone felt that the informer could assist him on the outside, Malone confided in the informer and enlisted, he thought, the informer's assistance in disposing of the body. Although it does not definitively appear in the record that the informer gained any benefit from the State for the disclosures he was able to obtain from Malone, it was indirect surreptitious State action *341 which elicited Malone's incriminating statements without assistance of counsel and therefore in violation of Malone's sixth amendment right.
Reviewing the record in light of the error of admitting these incriminating statements into evidence, we are unable to conclude beyond a reasonable doubt that the informer's testimony did not influence the jury. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Since we conclude that this error is reversible, we find it unnecessary to resolve Malone's remaining challenges to his convictions and sentences.
Accordingly, the judgments are reversed, and this cause is remanded for a new trial.
It is so ordered.
SUNDBERG, C.J., and BOYD, OVERTON, ENGLAND and McDONALD, JJ., concur.
ADKINS, J., dissents.