697 So.2d 1002 (1997)
Mompoint VOLTAIRE, Appellant,
v.
STATE of Florida, Appellee.
No. 96-0408.
District Court of Appeal of Florida, Fourth District.
August 13, 1997.
*1003 Richard L. Jorandby, Public Defender, and Joseph R. Chloupek, Assistant Public Defender, West Palm Beach, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Sarah B. Mayer, Assistant Attorney General, West Palm Beach, for appellee.
WARNER, Judge.
We consider in this case whether the police are precluded from placing an undercover officer in a jail cell with a defendant to extract incriminating statements from him. We hold that the deception practiced by the police in this case violated the defendant's due process rights and reverse.
The defendant/appellant was arrested for trafficking in cocaine and conspiracy to traffic in cocaine by the undercover officer who had worked on setting up a drug transaction with him. Although appellant had spoken in English with the officer prior to discovering that he was a police officer, he refused to speak to him further after the arrest and spoke only in Creole. According to the arresting officer, it was clear that appellant did not want to talk with him. Thereafter, appellant was booked into the jail. Officer Poliard was summoned to the jail to try to get a statement from appellant. He went into appellant's jail cell in an undercover capacity, wearing a t-shirt, shorts, and sneakers. He was told to sit in the cell and see if appellant wanted to talk. Since Poliard could speak both Creole and English, he spoke to appellant in both languages. Poliard initiated the contact by asking appellant what he was in for, to which appellant responded "cocaine." Appellant asked Poliard the same, and Poliard said he had a bad tag on his car, cocaine on his person, and his probation would be violated which would result in a five year prison sentence. Appellant said that the police told him that he would have to do ten years. Poliard asked why, and appellant said he set up a deal for two kilos of cocaine with a police officer but denied ever touching or delivering the cocaine. Appellant continued to give Poliard details of the crime.
Appellant moved to suppress the statements made to Officer Poliard, contending that the method used in acquiring the incriminating statements violated appellant's right to due process, citing Walls v. State, 580 So.2d 131 (Fla.1991). However, relying on Illinois v. Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990), the trial court denied the motion, finding that the words spoken between appellant and the officer were a conversation and not an interrogation.
In Perkins, the Supreme Court held that an undercover law enforcement officer, passing as an inmate, was not required to give Miranda warnings to an incarcerated suspect before asking him questions that may elicit an incriminating response. 496 U.S. at 300, 110 S.Ct. at 2399. In Justice Brennan's concurring opinion in Perkins, he stated:
This is not to say that I believe the Constitution condones the method by which the police extracted the confession in this case. To the contrary, the deception and manipulation practiced on respondent raise a substantial claim that the confession was obtained in violation of the Due Process Clause. As we recently stated in Miller v. Fenton, 474 U.S. 104, 109-110, 106 S.Ct. 445, 448-449, 88 L.Ed.2d 405 (1985):
"This Court has long held that certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment.... Although these decisions framed the legal inquiry in a variety of different ways, usually through the `convenient shorthand' of asking whether the confession was `involuntary,' Blackburn v. Alabama, 361 U.S. 199, 207 [80 S.Ct. 274, 280, 4 L.Ed.2d 242] (1960), the Court's analysis has consistently been animated by the view that `ours is an accusatorial and not an inquisitorial system,' Rogers v. Richmond, 365 U.S. 534, 541 [81 S.Ct. 735, 739, 5 L.Ed.2d 760] (1961), and that, accordingly, tactics *1004 for eliciting inculpatory statements must fall within the broad constitutional boundaries imposed by the Fourteenth Amendment's guarantee of fundamental fairness."
That the right is derived from the Due Process Clause "is significant because it reflects the Court's consistently held view that the admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to this suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne." Id., at 116, 106 S.Ct. at 452. See Spano v. New York, 360 U.S. 315, 320-321, 79 S.Ct. 1202, 1205-1206, 3 L.Ed.2d 1265 (1959) ("The abhorrence of society to the use of involuntary confessions does not turn alone on their inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves"); see also Degraffenreid v. McKellar, 494 U.S. 1071, 1072-1074, 110 S.Ct. 1794, 1794-1796, 108 L.Ed.2d 794 (1990) (MARSHALL, J., joined by BRENNAN, J., dissenting from denial of certiorari).
The method used to elicit the confession in this case deserves close scrutiny. The police devised a ruse to lure respondent into incriminating himself when he was in jail on an unrelated charge. A police agent, posing as a fellow inmate and proposing a sham escape plot, tricked respondent into confessing that he had once committed a murder, as a way of proving that he would be willing to do so again should the need arise during the escape. The testimony of the undercover officer and a police informant at the suppression hearing reveal the deliberate manner in which the two elicited incriminating statements from respondent. See App. 43-53 and 66-73. We have recognized that "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." United States v. Henry, 447 U.S. 264, 274, 100 S.Ct. 2183, 2188, 65 L.Ed.2d 115 (1980). As Justice MARSHALL points out, the pressures of custody make a suspect more likely to confide in others and to engage in "jailhouse bravado." See post, at 2402. The State is in a unique position to exploit this vulnerability because it has virtually complete control over the suspect's environment. Thus, the State can ensure that a suspect is barraged with questions from an undercover agent until the suspect confesses. Cf. Mincey v. Arizona, 437 U.S. 385, 399, 98 S.Ct. 2408, 2417, 57 L.Ed.2d 290 (1978); Ashcraft v. Tennessee, 322 U.S. 143, 153-155, 64 S.Ct. 921, 925-927, 88 L.Ed. 1192 (1944). The testimony in this case suggests the State did just that.
The deliberate use of deception and manipulation by the police appears to be incompatible "with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means," Miller, supra, 474 U.S. at 116, 106 S.Ct. at 452, and raises serious concerns that respondent's will was overborne. It is open to the lower court on remand to determine whether, under the totality of the circumstances, respondent's confession was elicited in a manner that violated the Due Process Clause. That the confession was not elicited through means of physical torture, see Brown v. Mississippi, 297 U.S. 278, 56 S.Ct. 461, 80 L.Ed. 682 (1936) or overt psychological pressure, see Payne v. Arkansas, 356 U.S. 560, 566, 78 S.Ct. 844, 849, 2 L.Ed.2d 975 (1958), does not end the inquiry. "[A]s law enforcement officers become more responsible, and the methods used to extract confessions more sophisticated, [a court's] duty to enforce federal constitutional protections does not cease. It only becomes more difficult because of the more delicate judgments to be made." Spano, supra, 360 U.S. at 321, 79 S.Ct. at 1206.
496 U.S. at 301-03, 110 S.Ct. at 2399-2401.
In Walls, the supreme court found that the due process clause of the Florida Constitution *1005 embodied the principles of fundamental fairness elaborated by Justice Brennan:
Due Process contemplates that the police and other state agents act in an accusatorial, not an inquisitorial, manner. Gross deception used as a means of evading constitutional rights has no place in such a system.
580 So.2d at 133-34. The ruse in Walls consisted of a correctional officer conducting surveillance of the defendant. The officer engaged the defendant in conversations, assuring him that anything he said was confidential and insisted that he not tell his attorney. Her observations were passed on to state psychiatrists who were examining the defendant's competency. The court held that the psychiatrists could not rely on these statements extracted from the defendant by the officer. Id. at 135.
Another ruse was used in Malone v. State, 390 So.2d 338 (Fla.1980). There, the statements sought to be suppressed were obtained by a fellow inmate who acted in concert with the police in a charade to get the defendant to disclose the location of the body of the victim that the defendant was accused of murdering. The defendant had invoked his Miranda rights and right to counsel, and the supreme court held that the inmate conversations prompted by the police were "indirect surreptitious State action which elicited Malone's incriminating statements without assistance of counsel and therefore in violation of Malone's sixth amendment right." Id. at 340-41. Although the issue of due process was not discussed in the opinion, Malone was cited in Walls as support for its conclusion that gross police deception violates due process.
While the trial court found that the conversation between Poliard and the appellant did not amount to an interrogation, under Traylor v. State, 596 So.2d 957 (Fla. 1992), "[i]nterrogation takes place for Section 9 purposes when a person [in custody] is subjected to express questions, or other words or actions, by a state agent, that a reasonable person would conclude are designed to lead to an incriminating response." Id. at 966 n. 17. In the trial court's finding that the conversation did not constitute an interrogation, the court restated the testimony from Poliard. In doing so, the court misstated that appellant had initiated the conversation by asking Poliard, "What are you in for?" The record is clear that Poliard actually initiated the conversation. He also asked appellant why he would have to do ten years in prison, which elicited the incriminating responses. In our view, the officer initiated an interrogation under Traylor. Certainly, the purpose of the questions was "designed to lead to an incriminating response."
As appellant was in custody and was being interrogated, he had a constitutional right to remain silent. Walls prohibits the police from engaging in a "gross deception" as a means of evading those constitutional rights. We think this qualifies as a gross deception. The police brought Poliard to appellant's cell looking much like any other person being placed in a jail cell after being arrested. The police even appeared to remove handcuffs from Poliard's wrists as he was being placed in the cell. Poliard was chosen because he spoke Creole, after appellant claimed to the arresting officer that he had difficulty understanding English. It seems clear that the police went out of their way to deceive appellant into making a statement without concern for appellant's constitutional rights. Under the principle of Walls, appellant's due process rights were violated.
Despite the existence of other taped conversations between appellant and the undercover officer who arranged the cocaine transaction, we do not deem the error in admitting appellant's confession to Poliard as harmless error. Appellant claimed that a confidential informant had promised him money to stand next to the informant as he discussed the cocaine transaction with the undercover officer. During this meeting, the informant spoke to appellant in Creole, telling him to tell the police that he would "cook" the cocaine for them, although in reality it would be the informant who would perform that task. Many portions of the tape of this conversation are unintelligible. During its deliberations, the jury asked for an interpretation of the portion of the conversation spoken in Creole between the appellant *1006 and the informant. Because it was not translated during the trial, it was not available for the jury. However, in light of the jury's consideration of the appellant's version of events, the jailhouse admission of appellant to Poliard may well have convinced the jury of appellant's guilt.
For the foregoing reasons, we reverse appellant's conviction and sentence and remand for a new trial.
GUNTHER and KLEIN, JJ., concur.