PER CURIAM.
Joseph Smith appeals his convictions for first-degree murder, kidnapping, and capital sexual battery and his sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons that follow, we affirm the convictions and the sentences imposed by the trial court.
I. FACTS AND PROCEDURAL HISTORY
On February 20, 2004, Joseph Peter Smith was charged with one count of sexual battery by a person over eighteen years of age upon a child less than twelve years of age and one count of kidnapping for the alleged abduction of and sexual battery upon Carlie Jane Brucia, an eleven-year-old female. That same day, Smith was also indicted on one count of first-degree murder for the killing of Ms. Brucia.
The trial court record reflects that on February 1, 2004, Carlie Brucia left the Sarasota home of a friend between 6:10 and 6:15 p.m. to walk home. The mother of the friend called Carlie’s mother to verify that permission had been given for the young girl to walk home alone. The mother advised that she had not given permission and immediately sent Carlie’s *845 stepfather to transport Carlie. When the stepfather arrived at the house of the friend, Carlie had already left. At approximately 7:30 p.m., after attempts to locate Carlie failed, a 911 call was made to report her missing. Law enforcement officers canvassed the area where Carlie would have walked from her friend’s house to her home until 3 a.m. and continued the search throughout the morning of February 2, 2004. At approximately 12 p.m., a bloodhound tracked the scent of Carlie to the area behind a car wash located on Bee Ridge Road, where the dog suddenly lost her scent.
The proprietor of the car wash was advised that police officers and dogs were outside the business, and that the police were securing the area. The proprietor spoke with law enforcement and learned that a young girl was missing. He informed law enforcement that he had motion-sensitive cameras installed around the car wash and offered to review them to see if anything of use had been captured. A recording from one of the cameras, which was located at the rear of the car wash, revealed that at approximately 6:21 p.m. a girl (subsequently identified as Carlie) was led away from the car wash by a man dressed in what appeared to be a mechanic’s uniform. On the evening of February 2, 2004, a video of the apparent abduction was released to the media and an Amber Alert was issued for Carlie.
On the morning of February 3, 2004, the wife of a former business associate of Smith saw the video on television, recognized the man in the video as Smith, and asked her husband to also view the video. The husband watched the video a number of times and recognized the man in the video as Smith:
I worked with him at the shop, so I knew what he looked like. The sneakers, the back of his — the way his hair was cut, the way that he walked, his gait was just like Joe walking through the shop. I mean, he’s got a different type of walk to him. And then when I watched him ... reach for the girl ... the way he reached for it was — I’ve seen him pick up tools like that, you know.... I knew it was him.
The husband called the police, spoke with Detective Vincent Riva, and provided Riva with Smith’s current address.
Riva and his partner proceeded to the address in an unmarked vehicle and were met there by two other officers. After a neighbor advised that someone was in the residence, the detectives approached the front door and knocked, but when no one responded, a detective called his supervisor and was advised that Smith was on probation. He then called Smith’s probation officer and asked her to respond to the address. After the officers had been at the residence for approximately forty-five minutes, Smith’s sister arrived at the scene and advised that she would retrieve her brother.
When Smith exited the house, a detective interrogated Smith with regard to his activities on the day of the abduction without specifically asking whether he had been at the car wash. Smith provided a timeline of his actions on February 1, which did not place him at or near the car wash that day. When a detective requested permission to examine Smith’s tattoos, Smith inquired as to the purpose of the visit by law enforcement. A detective advised that they were investigating an abduction, to which Smith replied that he had no knowledge of an abduction. When Smith was confronted with a still photo from the car wash video, Smith responded: “That looks like me, but it’s not me.” A detective requested permission from Smith to search both the room in the house that Smith rented and his car, which was *846 parked at that location. Smith consented and signed a written consent form.
The search of Smith’s room did not reveal anything of evidentiary value (although the detective did see a number of mechanic’s uniforms in the closet). However, when Smith’s vehicle was searched, a spoon was discovered under the front seat which appeared to have been used to melt or burn narcotics. A search of the trunk of the car revealed a cardboard box, which contained another spoon similar to the first and a syringe. When the probation officers arrived, the officers advised them of the items found in the car, and Smith was arrested for violation of probation and possession of drag paraphernalia.
As the vehicle search was being conducted, an owner of the house where Smith was living arrived in a yellow station wagon. When asked about Smith’s whereabouts on February 1, she recalled that at around 6:30 p.m., Smith had engaged in a telephone call with his estranged wife from that residence. The detective explained that based on this information, the homeowner had basically established an alibi for Smith, he was “temporarily cleared” in the investigation, and the detectives left the residence to pursue other leads in the abduction case. However, later that day at approximately 6:30 p.m. (Tuesday, February 3), the husband of the woman with whom the detectives had interacted at the residence earlier that day appeared at the police station and informed the detective that his wife’s recollection of the events from the evening of February 1 was inaccurate. The husband explained that Smith had borrowed his yellow station wagon at approximately 3 p.m. on February 1 and did not return it until approximately 7 a.m. on February 2.[1] The husband also identified Smith as the individual on the car wash video and relinquished the station wagon to the Sarasota County Sheriffs Office (SCSO). After receiving Miranda[2] warnings from the detective assigned to the abduction case, Smith invoked his right to counsel.
During the evening of February 4, 2004, John Smith, the brother of the defendant, arrived at the SCSO and was interviewed by FBI agents.[3] John informed them that although he was not on good terms with his brother, he had received a phone call from Smith at approximately 8 p.m. on Sunday, February 1, the night of the abduction. John refused to speak with his brother at that time. On Monday night, John and his girlfriend saw the abduction video on television. John recognized his brother in the video based upon the abductor’s face and hair, and the fact that the abductor was wearing a mechanic’s uniform. The girlfriend believed that the abductor was Smith because Smith had a distinctive walk due to prior back surgery. That same night, Smith appeared at John’s house at approximately 11 p.m. Smith was apparently under the influence of drugs, and John sent his brother away.
When asked if he could identify that the abductor captured on video was his brother, John replied:
*847 I don’t have any concrete evidence[,] it’s just, it looks like him, it walks like him, the more I look at that video, the more I look at him, the more I look at the video[,] it just well, total resemblance, if it’s not him.
During the interview, the FBI agent asked, “Have you ever thought about going to see him and asking if he did this?” John replied that if Smith had abducted the child, he would not confess; instead, “he will die with that secret. If it’s him. You won’t get it out of him.” John then suggested that the only way to obtain any information from Smith would be to engage in trickery. John advised that if someone informed Smith that he or she had engaged in improper conduct similar to that for which Smith was being investigated, Smith would most likely open up and provide details about his own actions.
Later that evening, after the interview concluded, John informed the FBI agent that he wanted to see his brother. SCSO personnel advised the FBI agent that Smith had retained counsel, and any meeting would need to go through Smith’s attorney. The next morning, Thursday, February 5, 2004, the public defender arranged a meeting between Smith, John, and their mother. The mother exited the interview room after approximately forty-five minutes, and John remained with Smith for an additional thirty minutes. When he exited the interview room, John commented that Smith “came close, but he didn’t say anything.” After exiting the room, neither John nor his mother was debriefed by law enforcement, and no surveillance was placed upon them when they left the building.
On the evening of February 5, 2004, John called the FBI agent from his cell phone and stated: “I guess you heard, what do you want to do?” Although John’s cellular phone had never been tapped by law enforcement, John apparently believed that it had, and the FBI agent then realized that Smith must have provided John with information about Car-lie. Two FBI agents along with one local officer travelled to John’s residence, and John then directed the law enforcement officials to a local church. When they arrived at the church, John provided the investigators with an area in the field behind the church where they should look for a body. While at the church, John received a call from Smith. John eventually confirmed that Carlie’s body was located approximately fifty yards from a group of concrete blocks out in the field.
After other officers arrived at the church and based upon the directions provided by John, Carlie’s body was found in a wooded area of the field. She was lying on her back, naked below the waist except for a sock on her right foot, with her right leg stretched out and her left leg bent back and curled under her left buttock. A deep ligature mark was visible on her neck.
The FBI agents returned to the SCSO with John to obtain a second statement. John confessed to the agents that he lied to them during the morning meeting when he stated that Smith had not made any statements about Carlie. John now related that Smith had initially said, “I’m sorry I did this to you.” After Smith’s mother left the room, Smith informed John that on the night in question he ingested what he believed was cocaine and that everything that occurred afterwards was a blur. According to John, “It felt like he was afraid to say ‘you know she’s dead’ so I just said, ‘okay, Joe she’s dead, fine, where is she? Where is she? We gotta find her. Where is she?’ ” Smith then revealed that Carlie was in a field near a church on Proctor Road. John advised the agents that he had not provided them with this information *848 after the earlier meeting because he did not believe his brother and because Smith never stated that he had murdered Carlie. John explained that after he left the jail with his mother, they proceeded to the church on Proctor Road, and John looked for the body without success.
That night, John spoke with Smith by telephone and advised him that he had been to the church but could not find the body. Smith then informed John that he had engaged in a sexual act with the girl in the car, and “it got carried away.” When John asked if Smith had sexual intercourse with her, Smith responded in the affirmative. When John inquired if Carlie was dead, Smith responded, “I don’t know, she could be.” John decided to call the FBI agents after Smith admitted the sexual conduct and because, when John asked for specific details with regard to Carlie’s location, Smith requested his attorney. John also revealed that during the phone call at the church, Smith admitted that he had “rough sex” with Carlie before he strangled her.
Subsequent to his arrest, Smith was transferred from the Sarasota County Jail to the Manatee County Jail. Before Smith’s capital trial, discussions between Smith and family members were recorded at the jail and were later played in the presence of the jury during the trial:
February 9, 2004—
MOTHER: Oh, Joe, the best thing that ... you can do is try to explain it was an accident.
SMITH: But it was an accident, Mom.
MOTHER: I know that Joe.
SMITH: You don’t think I would do that on purpose, Mom.
MOTHER: No. No, I don’t. I don’t think so at all Joe. Not at all. I know you better than that. But everyone ... is up in arms, the community, the press, the ... governor, the mayor. You just don’t know, Joe.
[[Image here]]
SMITH: Yeah, Mom. You know what my charges are, right?
MOTHER: Yeah, I do. Yeah, I do. You want me to tell [your estranged wife] anything?
SMITH: Yeah, Mom. Teh her that— does she know what happened, the drugs and everything?
MOTHER: Yeah, she knows.
SMITH: That I didn’t mean to do it. She knows I’m not an animal, right?
February 10, 2004,—
JOHN: You had to have met the girl before, the young girl.
SMITH: No.
JOHN: Because she knew you.
SMITH: No, John.
JOHN: Not to mention the fact that she don’t look nowhere [sic] 11 years old. I was thinking 16 or 17.
SMITH: That’s what I thought, too.
February 19, 2004■ — ■
JOHN: How much time did you spend with her?
SMITH: It was — I was so far out there. You know, I ...
JOHN: [D]id it happen right there and then you drove there?
SMITH: It wasn’t very long.
JOHN: An hour? Two hours? Did you go back afterwards to look again? What made you pick that place?
SMITH: Quiet.
[[Image here]]
JOHN: She started something in the car?
SMITH: Yeah.
*849 JOHN: Where did you finish? There? And what made you finish it?
SMITH: [Inaudible] scared.
JOHN: Scared?
SMITH: I’m telling you. The adrenaline. I don’t know. I just, I don’t know.
[[Image here]]
JOHN: Oh, what’s some more things that I — like you were just driving around and you copped, right?
SMITH: John, I was doing in the car and everything and—
JOHN: And then what? You saw her walking?
SMITH: Yeah. Actually running.
JOHN: And then you parked somewhere.
SMITH: Uh-huh. Yeah....
[[Image here]]
SMITH: I do love [my daughter]. I didn’t do any of this to hurt anybody.
JOHN: What I originally ... wanted to do way back in the beginning, I never got to do it because I couldn’t find it, remember I wanted to open (inaudible) shop?
SMITH: Yeah.
JOHN: Didn’t happen. I couldn’t find the material.
SMITH: That was bad. That was a bad idea anyway.
JOHN: You’re probably right, but he [sic] could have sold it for big, big bucks. Your kids could have went to college.
SMITH: No. John, it was a bad, bad idea. Not only because of what it would have done to you, to be there and see that, but they would have followed you and they would have implicated you.
[[Image here]]
SMITH: Tell mom this, okay? Because [the priest] came, I talked to him for quite a while about, you know, how I was brought up.... And then I did an Act of Contrition, which means he wipes all my sins away. You know, we did confession. I confessed to everything. Murder, all types of stuff. You know what I mean? Anything that could be— you know, I just confessed to everything.
In addition to these conversations, on April 9, 2005, a letter from Smith to John, written in code, was intercepted by jail personnel. During trial, a cryptanalyst testified that the code had been broken and the message contained in the letter was the following:
I WLSH L HAD SOMETHLN JULCY TO SAY OH OK THE BACKPACK[4] AND CLOTHES WENT IN FOUR DIFFERENT DUMPSTERS.... I LEFT IT OUT IN THE OPEN I DRAGED THE BODY TO WHERE ST WAS FOUND DESTROY THIS AFTER DECIFERING IT AND SHUT UP.
Sarasota County medical examiner Dr. Vincent Vega concluded that Carlie died as a result of strangulation because there was a ligature mark around her neck, and there were no other evident injuries to her head or torso. Dr. Vega testified that a shoelace was consistent with the type of ligature that would make the indentations on her neck. The marks on the neck were deeper in the front than in the back and appeared to criss-cross in the back. These findings led Dr. Vega to conclude that during the strangulation, the ligature was not tied, but was held in the perpetrator’s hands while he was standing behind the *850 victim.[5] Dr. Vega explained that if sufficient pressure is continuously applied to cut off the blood supply to the brain, unconsciousness will ensue in approximately eight to ten seconds; however, application of this pressure must continue for two to four minutes for death to result. Although Dr. Vega did not locate any defensive injuries on the body, he noted that ligature marks were found on the victim’s wrists, indicating that she had been bound. There were also bruises on the inside of her right thigh and in the shin area of her right leg indicative of blunt-force trauma. Dr. Vega testified that these bruises could have been caused by a struggle with the perpetrator.[6] Dr. Vega also testified that abrasions on the side of the body indicated that the victim had been dragged.
Oral, anal, and vaginal swabs obtained from the body tested negative for semen. However, Dr. Vega testified that the presence of insect larvae and decomposition of the body impeded his ability to obtain optimal results from such testing. Dr. Vega further testified that he observed damage to the hymen membrane of the child. According to Dr. Vega, this injury was consistent with a pre-mortem loss of tissue due to penetration (i.e., sexual activity). However, Dr. Vega also noted that the larvae present on the victim could have caused the hymenal defect, and it merely appeared that the victim had suffered a premortem injury. Dr. Vega expressed the opinion that, based upon all of the available evidence, the victim had been sexually battered. In support of this conclusion, Dr. Vega explained that case reports and studies have demonstrated that ligature strangulations are most common in female victims and are highly associated with sexual batteries. Dr. Vega also reached his conclusion based upon the state of the victim’s clothing when she was found; i.e., she was naked from the waist down. Lastly, Dr. Vega reached his conclusion based upon Smith’s statements and DNA testing results which revealed the presence of semen on the back of Carlie’s shirt.
An FBI team supervisor testified that the semen sample found on Carlie’s shirt matched Smith’s DNA profile at all thirteen relevant locations on the DNA strand. The supervisor testified that the likelihood of randomly selecting a DNA profile of a Caucasian male that matched the DNA sample found on the shirt was 1 in 32 quintillion. An FBI hair-and-fiber analyst testified that two head hairs recovered from the yellow station wagon that had been relinquished to the SCSO were consistent with the hair of the victim. Further, seven fibers that were removed from the station wagon were consistent with the fibers contained in the red shirt that Carlie was wearing on the day of her abduction and murder.
Smith chose not to testify on his own behalf and waived his guilt-phase closing statement. The jury convicted Smith of first-degree murder, sexual battery upon a child less than twelve years of age, and kidnapping.
During the penalty phase, the State presented evidence that Smith was on drug *851 offender probation during the time of these crimes. Dr. Vega testified that he believed Carlie was conscious when the ligature was applied to her throat because there was no evidence of an injury that would have produced unconsciousness. Moreover, the ligature marks on the wrists indicated that she was restrained. Finally, the State offered victim-impact statements written by Carlie’s father, mother, stepfather, and a teacher.
Smith presented nineteen penalty-phase witnesses, who provided the following evidence: (1) Smith was extremely helpful to his friends, family, and neighbors; (2) Smith loved animals; (3) Smith’s father had a drinking problem; (4) Smith appeared to have a good relationship with his children and loved them; (5) Smith began taking drugs at an early age, and addiction and relapse pervaded his adult life; (6) Smith suffered from chronic back pain and became addicted to prescription drugs; (7) Smith had expressed the desire to cease his drug use; (8) Smith’s life began to unravel after he discovered the body of his best friend after a drug overdose; (9) Smith had been hospitalized or admitted to treatment programs for his drug addiction over a period of years and also for depression and suicidal thoughts;[7] (10) Smith had no disciplinary problems and had not engaged in violent acts while he was in jail; (11) Smith sought spiritual counseling; and (12) if Smith received a life sentence, he would be housed at the highest level of security, and it was highly unlikely that his security status would ever change. Smith declined to testify during the penalty phase; however, he requested an opportu nity to make an allocution statement before the jury. The trial court declined to permit allocution before the jury unless Smith agreed to be subject to cross-examination by the State. Smith was allowed to provide such a statement during the later Spencer[8] hearing.
In rebuttal, the State presented a letter written by Smith to another inmate housed in the Manatee County Jail that had been intercepted. The letter expressed a desire for violence on his brother John and requested that a violent act be committed upon another inmate.
On December 1, 2005, the jury recommended a death sentence by a vote of ten to two. During thé Spencer hearing, defense counsel explained that he would not call any experts to testify with regard to mental-health mitigation and would only introduce this mitigation through documentary evidence. The trial court inquired of both defense counsel and Smith with regard to this decision. Smith then offered the testimony of Dr. Vega, who testified that when he viewed the photos of Smith, he identified injection marks that were consistent with intravenous drug use. Smith offered an allocution statement to the court which provided, in part:
After a little time went by, I had called my wife and I had asked to come home, but on February 1st, I found out that she didn’t want me.... I lost my business, my family, and my self-control was really coming apart fast. I just wanted to die on that day. So I went out, copped a bunch of heroin, cocaine, and *852 began injecting it hoping I would overdose .... I was so high, I’ve never experienced a high like that. It was different than any other time. I think it was mixed with something else.
... I want you to know that I take Ml responsibility for the crimes. I don’t know how this all happened. I was very angry at myself and very high. I knew that getting high was wrong but I could not stop....
I’m not trying to make excuses for what happened, but I really don’t remember much about anything on that day after about 4:00 p.m.
On March 15, 2006, the trial judge sentenced Smith to death for the murder. The trial court determined that the State had proven beyond a reasonable doubt the existence of six statutory aggravators: (1) Smith committed the felony while he was on probation, see § 921.141(5)(a), Fla. Stat. (2003) (moderate weight); (2) the murder was committed while Smith was engaged in the commission of a sexual battery or kidnapping, see § 921.141(5)(d), Fla. Stat. (2003) (significant weight);[9] (3) the murder was committed for the purpose of avoiding lawful arrest, see § 921.141(5)(e), Fla. Stat. (2003) (great weight); (4) the murder was especially heinous, atrocious or cruel (HAC), see § 921.141(5)(h), Fla. Stat. (2003) (great weight); (5) the murder was cold, calculated, and premeditated (CCP), see § 921.141(5)(i), Fla. Stat. (2003) (great weight); and (6) the victim was under twelve years of age, see § 921.141(5)(Z), Fla. Stat. (2003) (great weight).
The trial court concluded that Smith had failed to prove the existence of any statutory mitigating circumstances.[10] The trial court found a total of thirteen non-statutory mitigating circumstances: (1) a long and well-documented history of mental illness (moderate weight); (2) a long and well-documented history of drug abuse (moderate weight); (3) longstanding severe pain from back injuries that contributed to his addiction (little weight); (4) Smith repeatedly sought help for his problems (little weight);[11] (5) Smith was repeatedly denied treatment or received inadequate treatment (little weight); (6) positive qualities, including-(a) skills as a mechanic, plumber, and carpenter; (b) performance of kind deeds for others; (c) love and support with his family; (d) despite his incarceration, attempts to exert a positive influence on family members; (e) artistic skills; and (f) he cares about animals (moderate weight); (7) providing information that led to the resolution of this case (very little weight); (8) his family assisted law enforcement with Smith’s knowledge and cooperation (slight weight); (9) demonstration of spiritual growth *853 (moderate weight); (10) maintenance of gainful employment (slight weight); (11) he is á loving father to his three daughters (moderate weight); (12) remorse (little weight); and (13) he is amenable to rehabilitation and a productive life in prison (little weight).
In imposing a sentence of death, the trial court found that the aggravating circumstances in the case far outweighed the mitigating circumstances. The trial court also held that, with the exception of the probation aggravator, “[e]ach one of the aggravating factors in this case, standing alone, would be sufficient to outweigh the mitigation submitted in this case.”
This direct appeal followed. The State has filed a cross-appeal, which presents a single claim.
II. DIRECT APPEAL
A. Confrontation — DNA testimony
Smith first asserts that the State violated the Confrontation Clause of the Sixth Amendment to the United State Constitution when it failed to present the biologists who performed the DNA tests on the known sample taken from Smith and the unknown semen sample taken from the victim’s shirt. According to Smith, this highly significant forensic evidence required cross-examination of the person(s) who conducted the actual tests. During trial, the State instead presented the testimony of the FBI team supervisor, a forensic DNA examiner who interpreted the data, formulated the conclusions, and prepared the official report.
In evaluating whether a Sixth Amendment violation occurred, it is essential to examine the role of the team supervisor in the evaluation of the semen sample found on the victim’s shirt. During a proffer, the supervisor explained her role as the manager of a DNA-analysis team as follows:
I determine what items of [sic] exams will be conducted on which items. And I have the biologists who actually do[ ] the bench work for me. I then draw the conclusions, interpret their results and write the report and then testify, if needed.
When further asked to explain her duties as a team supervisor, she explained:
I manage the case, the case comes in, it gets assigned to me to be the DNA or serology manager. By that it means that I am in charge of talking with the contributors, determining what items will be worked. Then from there determining what stains will be worked. If the biologists have a question, they, you know, they can always come and talk to me about what exams to do and if further testing needs to be done.
When asked if she interprets the results of the tests conducted by the biologists on her team, the supervisor responded, “Yes, I do. I draw all the interpretations and all the conclusions based on their work— an example would be if they test for blood, they will write the results of the test, but then it is my interpretation that says blood is there on that item of evidence.” (Emphasis supplied.) She also testified that this protocol is standard for the FBI serology/DNA lab.
The supervisor also explained that the biologists on her team make notes and keep records of every test that they complete on a sample, that the notes become part of the file in the ease, and that she uses the notes to reach her conclusions and prepare the final report. The supervisor testified that she was the individual who compared the DNA sample taken from the victim’s shirt to that of Smith and determined that these specimens matched at all thirteen relevant locations on the DNA strand. She was also the individual who calculated the probability of selecting *854 an unrelated individual at random from the pertinent sample group who would have the same DNA profile as that found on the shirt.
In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that testimonial out-of-court statements that are introduced against a defendant violate the Confrontation Clause unless the de-clarant is unavailable and the defendant had a prior meaningful opportunity to cross-examine that witness. See id. at 68-69, 124 S.Ct. 1354. Smith contends that this ease presents the same issue as that confronted in State v. Johnson, 982 So.2d 672 (Fla.), cert. dismissed, — U.S.-, 129 S.Ct. 28, 171 L.Ed.2d 930 (2008), and that Johnson should control the outcome here. In Johnson, this Court held that a report prepared by a Florida Department of Law Enforcement analyst, which established the illegal nature of the substances that Johnson possessed, was admitted in violation of Crawford where the analyst who prepared the report did not testify during trial — instead, the report was introduced through her supervisor. See 982 So.2d at 673-74. We concluded that the report was testimonial in nature because the report there was clearly prepared in anticipation of trial and designed to establish an element of the crime. See id. at 680. An accusatory document such as the report there should only be admissible where the preparer is unavailable and the defendant had a prior opportunity to conduct cross-examination of the person who prepared the report. See id. at 680-81. Similarly, in State v. Belvin, 986 So.2d 516, 518 (Fla.2008), we held that admission of a breath-test affidavit violated the Confrontation Clause where the technician who performed the test did not testily during trial. Thus, in each of these cases, the person who prepared the report of the relevant results did not testify. See also Johnson v. State, 929 So.2d 4, 6 (Fla. 2d DCA 2005) (noting that the supervisor “did not conduct this particular test, but he was able to testify about the general procedures used by FDLE in preparing such reports”).
We have carefully considered both Florida and federal cases, and we conclude that the instant case is distinguishable from both Johnson and Belvin. Here, it was the supervisor in her capacity as the head of an FBI DNA-analysis team who evaluated the raw test results obtained by the biologists on her team and compared the DNA sample found on the victim’s shirt to the sample taken from Smith. She was the person who concluded that Smith’s DNA matched the DNA from the shirt and calculated the probability of a random individual from the pertinent sample group submitting a DNA sample that matched the sample obtained from the shirt. Thus, although the FBI team supervisor did not perform each actual test on the material found on the shirt and the buccal swab taken from Smith, she was the person who interpreted the data obtained from the testing and formulated the conclusions that incriminated Smith in the sexual battery. Thus, while the results that the supervisor obtained in this case were indubitably testimonial in nature, she was present at trial and subject to cross-examination with regard to those results.
At least two federal courts have held that the Sixth Amendment Confrontation Clause does not require an expert to have performed the actual laboratory work to permissibly testify with regard to conclusions that he or she has drawn from those results. In United States v. Moon, 512 F.3d 359, 362 (7th. Cir.), cert. denied, U.S. -, 129 S.Ct. 39, 172 L.Ed.2d 19, and cert. denied, — U.S.-, 129 S.Ct. 40, 172 L.Ed.2d 19 (2008), the Seventh Circuit Court of Appeals concluded that *855 “the Confrontation Clause does not forbid the use of raw data produced by scientific instruments, though the interpretation of those data may be testimonial.” (Emphasis supplied.) Similarly, the Fourth Circuit Court of Appeals held that a Confrontation Clause violation did not occur where the chief toxicologist of a lab reviewed the data from tests conducted by technicians at the lab and issued a report based upon that data where the toxicologist testified at trial with regard to his conclusions. See United States v. Washington, 498 F.3d 225, 228 (4th Cir.2007) (“While Dr. Levine did not see the blood sample and did not conduct any of the tests himself, three lab technicians operating under his protocols and supervision conducted the tests and then presented the raw data from the tests to him.”).
We find the rationale followed by the federal courts in Moon and Washington to be persuasive with regard to the challenge raised by Smith. Accordingly, even though the FBI team supervisor did not actually perform the testing to extract DNA samples from the shirt and from Smith, her testimony did not implicate the Confrontation Clause because she, as supervisor, formulated her own conclusions from the raw data produced by the biologists under her supervision and control on her team, and she was subject to cross-examination with regard to those conclusions.[12] Accordingly, relief on this claim is denied.

B. Sexual Battery Opinion Testimony

Smith next asserts that the trial court erred when it permitted Dr. Vega to present opinion testimony that the victim had been sexually assaulted. Smith asserts that to allow Vega to testify with regard to commonly understood facts invaded the province of the jury and created the possibility that the jury would forgo independent analysis of the evidence to determine whether a sexual battery occurred.
We have explained that “[t]he determination of a witness’s qualifications to express an expert opinion is peculiarly within the discretion of the trial judge, whose decision will not be reversed absent a clear showing of error.” Ramirez v. State, 542 So.2d 352, 355 (Fla.1989). Section 90.702, Florida Statutes (2005), provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial.
Section 90.704, Florida Statutes (2005), further provides guidelines for the data upon which an expert may rely to reach an opinion or conclusion: “If the facts or data are of a type reasonably relied upon by experts in the subject to support the opin *856 ion expressed, the facts or data need not be admissible in evidence.”
This Court has previously allowed a qualified expert to testify that, based upon the circumstances surrounding the discovery of the victim’s body, a sexual battery likely occurred. Specifically, in Dailey v. State, 594 So.2d 254, 258 (Fla.1991), this Court addressed and rejected a challenge similar to that raised by Smith here:
During the penalty phase, the judge qualified Detective Halliday as an expert in homicide and sexual battery and allowed him to testify that because the victim’s body was found nude and her clothing scattered, it was highly likely that a sexual battery or attempt had occurred. Dailey claims that this testimony was only common sense and it was error for the court to permit expert testimony on a matter that is within the common understanding of the jury. Halliday, however, had extensive training and experience in homicides and sexual batteries; his expert testimony was helpful in consolidating the various pieces of evidence found at the crime scene. This would not necessarily be within the common understanding of the jury. We find no error.
We conclude that, with the exception of the testimony discussed below, the trial court did not abuse its discretion when it permitted Vega to present opinion testimony as to whether this victim had been sexually battered. During trial, Dr. Vega testified that various aspects of the crime scene were consistent with sexual battery: (1) the victim was discovered naked below the waist;' (2) there was evidence of tearing to the victim’s hymen, and one possible cause of that tearing could have been penetration during a sexual battery; (3) bruises on the body could have been caused by a struggle with her attacker; and (4) it is more likely that the victim’s jeans and underwear were removed before she was dragged to the location where her body was found, rather than pulled off while she was dragged, based upon the uniformity of the abrasions found.
The fact that there were alternative explanations for the condition of the body does not render Dr. Vega’s testimony inadmissible. Rather, it was for the jury to decide what weight to accord Dr. Vega’s opinion based upon any alternative explanations. See Delap v. State, 440 So.2d 1242, 1253-54 (Fla.1983); see also Dailey, 594 So.2d at 258 (detective’s testimony that it was highly likely a sexual battery occurred was admissible because it “was helpful in consolidating the various pieces of evidence found at the crime scene”). The testimony of Dr. Vega assisted the jurors in deciding what happened, not who was responsible for the acts perpetrated against the victim. Cf. Martinez v. State, 761 So.2d 1074, 1079 (Fla.2000) (“[A] witness’s opinion as to the guilt or innocence of the accused is not admissible.”). Accordingly, we conclude that Dr. Vega’s opinion that the evidence pointed to a sexual battery here was properly admitted.
We agree with Smith, however, that the trial court should have excluded one portion of Dr. Vega’s testimony — that ligature strangulation is “highly associated” with sexual battery. Dr. Vega failed to provide any basis whatsoever to support a purported connection or correlation between these two elements, no evidence of such a connection was found here, and Dr. Vega had no research, data, or other material from which he drew this conclusion. Since it is impossible to determine from Dr. Vega’s testimony whether the facts or data were of a type reasonably relied upon by experts to support the opinion expressed, it is impossible to evaluate whether Dr. Vega’s conclusion is scientifically *857 supported or even valid. Absent adequate explanation of data, research, or other material from which this conclusion was drawn, we conclude that Dr. Vega should not have been allowed to express the opinion of a purported abstract connection between ligature strangulation and sexual battery.
However, defense counsel did not object to this particular statement, nor did the defense ask Vega to provide more detail with regard to this statement during cross-examination. Accordingly, this challenge was unpreserved. We have held that “[t]he failure to contemporaneously object to a comment on the basis that it constitutes improper ... testimony renders the claim procedurally barred absent fundamental error.” Sexton v. State, 775 So.2d 923, 932 (Fla.2000) (emphasis supplied). To warrant reversal on the basis of fundamental error, “the error must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.” Walls v. State, 926 So.2d 1156, 1176 (Fla.2006) (emphasis supplied) (quoting Brown v. State, 124 So.2d 481, 484 (Fla.1960)). We conclude that Dr. Vega’s testimony with regard to the ligature strangulation/sexual battery connection did not rise to the level of fundamental error. As previously discussed, there was a plethora of evidence, including semen that matched the DNA profile of Smith and Smith’s confession to his brother that he engaged in “rough sex” with the victim, to support a conviction on this charge. We have no doubt that even if Dr. Vega had not presented this testimony, the jury nonetheless would have convicted Smith of capital sexual battery. Accordingly, no harmful error occurred, and Smith is not entitled to relief on this basis.

C. Statements by John Smith

Smith next asserts that the trial court erred when it refused to suppress statements by his brother, John, which related to comments made by Smith with regard to the sexual battery and murder of the victim. According to Smith, John obtained these statements while he was acting as an agent of the FBI and the SCSO. We disagree.
This Court has stated that “[a] trial court’s ruling on a motion to suppress comes to us clothed with a presumption of correctness and, as the reviewing court, we must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.” Connor v. State, 803 So.2d 598, 605 (Fla.2001) (quoting Murray v. State, 692 So.2d 157, 159 (Fla.1997)). Nevertheless, “mixed questions of law and fact that ultimately determine constitutional rights should be reviewed by appellate courts using a two-step approach, deferring to the trial court on questions of historical fact but conducting a de novo review of the constitutional issue.” Id. (citing United States v. Bajakajian, 524 U.S. 321, 336 n. 10, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998)).
We have previously addressed the state-agent concept and the constitutional issues presented by the use of state agents:
In Massiah [v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964) ], the United States Supreme Court announced for the first time that the Sixth Amendment prohibits law enforcement officers from interrogating a defendant after his or her indictment and in the absence of counsel. Consequently, statements “deliberately elicited” from a defendant after the right to counsel has attached and in the absence of a valid waiver are rendered inadmissible and cannot be used against *858 the defendant at trial. 377 U.S. at 206[, 84 S.Ct. 1199], Nevertheless, incriminatory statements by a defendant will not be excluded merely because the statements are made after judicial proceedings have been initiated and in the absence of a valid waiver. Rather, law enforcement officials must do something that infringes upon the defendant’s Sixth Amendment right.
While the “deliberately elicited” standard is clearly satisfied when the police directly interrogate or question a defendant in some fashion, it also may be satisfied by less direct types of questioning. See State v. Wooley, 482 So.2d 595, 596 (Fla. 4th DCA 1986). Usually, determining whether the “deliberately elicited” standard has been met becomes an issue in eases ... where incriminatory statements from a defendant were obtained through persons other than the police who allegedly acted as police informants or surrogates.
Rolling v. State, 695 So.2d 278, 290 (Fla. 1997) (footnote omitted). We held in Rolling that “a violation of a defendant’s right to counsel turns on whether the confession was obtained through the active efforts of law enforcement or whether it came to them passively.” Id. at 291 (emphasis supplied). For example, in Malone v. State, 390 So.2d 338, 339 (Fla.1980), an inmate and a detective established a plan whereby the inmate would be transferred to another jail. The inmate would then visit the defendant in civilian clothes and tell the defendant that he had been released, and that the inmate would attempt to retain an attorney for the defendant. See id. We held that the trial court erred when it failed to suppress the defendant’s statements to the inmate indicating that the defendant had killed the victim and providing directions as to where the body was located. See id. In so holding, we concluded that the statements were “directly elicited by the State’s stratagem deliberately designed to elicit an inciiminating statement from [the defendant].” Id. (emphasis supplied); cf. Dufour v. State, 495 So.2d 154, 159 (Fla.1986) (inmate was not a state agent where the inmate approached the authorities on his own initiative and, after speaking with authorities, the inmate was “neither encouraged nor discouraged from obtaining further information”).
We conclude that the record supports the determination by the trial court that John Smith was not acting as an agent of the State. First, both statements that John provided to FBI agents are transcribed in the record. Not once in either of these statements do the agents ask John to speak to his brother to determine whether Carlie was alive. While the agents on one occasion asked John, “Have you ever thought about going to see him and asking if he did this,” the agents did not further pursue this line of inquiry. It was John who volunteered that the only way to persuade Smith to talk would be to engage in trickery. However, in response to this statement by John, the agents did not request that he trick Smith in an effort to locate Carlie. The agents encouraged John to contact them further only if he had forgotten something. Further, after the morning meeting with Smith and his mother, when John informed the FBI agent that Smith “came close, but he didn’t say anything,” the agent did not question John further with regard to that statement.
Second, there is no indication that law enforcement arranged the morning meeting between John, Smith, and their mother. During the hearing on the motion to suppress, an FBI agent testified that after John provided his first statement, he subsequently called and demanded to see his brother. The agent followed the chain of command and eventually informed John that it was not possible to arrange a meet *859 ing with Smith that night because Smith had requested an attorney. SCSO personnel confirmed that the FBI agent was informed that a visit was not possible that night and could only be arranged through the public defender. It was the public defender who eventually requested the visitation between John, his mother, and Smith. Thus, the record reflects that law enforcement did not affirmatively arrange the meeting between John and his brother. Instead, law enforcement initially blocked John from seeing Smith and required that he arrange a meeting through the public defender.
Finally, John’s actions refute any contention that he was working as a State agent. John misled law enforcement with regard to the morning meeting with his mother and Smith. John then traveled with his mother to the church where Smith informed him that the victim’s body was located, and searched for the body. It appears that John may have been seeking some personal benefit for himself or his family, but not as a state agent. On February 19, 2004, when Smith advised John that it was a “bad idea” for John to search for the body, John replied, “You’re probably right, but he [sic] could have sold it for big, big bucks. Your kids could have went to college.” Finally, when Smith provided John with a note written in code that explained what happened to the victim’s belongings, John did not decipher the code for the State or relinquish the note voluntarily. The State was required to enlist the services of a cryptanalyst to decipher the message.
Based on these record facts, and the absence of any facts to support the agency theory, we conclude that the trial court properly denied suppression of John’s statements.

D. Juror Challenges

Smith next challenges the trial court’s refusal to strike nine jurors for cause. According to Smith, each of the jurors he sought to strike for cause provided sufficiently equivocal responses to generate a reasonable doubt as to their fitness to serve as jurors in this case.
We have described the duty of an appellate court to review denials of for-cause challenges as follows:
The test for determining juror competency is whether the juror can lay aside any bias or prejudice and render a verdict solely on the evidence presented and the instructions on the law given by the court. See Lusk v. State, 446 So.2d 1038, 1041 (Fla.1984). “In evaluating a juror’s qualifications, the trial judge should evaluate all of the questions and answers posed to or received from the juror.” Parker v. State, 641 So.2d 369, 373 (Fla.1994). A juror must be excused for cause if any reasonable doubt exists as to whether the juror possesses an impartial state of mind. See Bryant v. State, 656 So.2d 426, 428 (Fla.1995). The trial court has broad discretion in determining whether to grant a challenge for cause, and the decision will not be overturned on appeal absent manifest error. Overton v. State, 801 So.2d 877, 890 (Fla.2001).
Kopsho v. State, 959 So.2d 168, 170 (Fla. 2007).
We have considered Smith’s challenges with regard to each of the nine jurors and agree with Smith that the trial court erroneously denied two for-cause challenges. The first juror whom the trial court should have stricken was juror number 29.[13] Juror 29 indicated that he pos *860 sessed knowledge about the case because one of his employment duties was to update the internal computer-information network for the business, and he “broke” news to his staff as this case unfolded. When the trial court asked juror 29 whether he had formed impressions about the case, he replied, “yeah,” after which the following dialogue occurred:
COURT: Okay. Can you tell me what those are?
JUROR: I have a daughter who is the same age that Carlie was and, you know, up until that time, we had allowed her to ride her bike in our neighborhood. Now, with things being what they are, we decided that all of that is now supervised even though she’s now 13.
My impression being that, you know, having seen the videotape and everything that came out and that he made the confession, my thought is, okay, well, he’s accused, he probably did it. Those are the thoughts that are in my mind.
COURT: Do you feel that that impression or opinion that you have ... is so strong that it would always color your decision, would affect your decision in this case? Or do you feel that you can completely set that aside and any decision that you would make in this case as to the guilt or innocence of Mr. Smith as it relates to these charges would be based solely on the evidence that you received here in this courtroom and my instructions to you on the law? Or do you feel that those impressions that you have are going to bleed over and might fill the gaps for you here at the trial?
JUROR: Well, having a great respect for the judicial system, I think I would do my very best to be impartial and understanding that it would have to be based on the evidence. I would have to look at it in a very black and white manner, which is what I would like to consider myself being, a person of integrity who would be able to say that, you know, if this is what the law says, then we have to go by what the law says. So, for me, it would be a matter of integrity.
(Emphasis supplied.) Although juror 29 eventually stated that he would follow the law as a “matter of integrity,” we conclude that this statement was totally insufficient to overcome (1) his expressed opinion that Smith “probably did it,” (2) his employment duty to follow the Brucia case and provide updates to his coworkers, and (3) the fact that he changed his behavior towards his daughter based upon the events of the instant case.
We also conclude that the trial court erred when it refused to strike juror 89 for cause. Juror 89 painfully explained that he had been a witness in a capital case where his daughter was murdered and that the experience was “[v]ery, very painful.” When questioned further by the State, the prospective juror professed that “time is a great healer,” and stated that that he could follow the instructions given by the trial court as well as be fair during the trial. It is apparent from voir dire that this juror sincerely felt that he could be fair and impartial if he were selected to serve on this case. Although we do not question this sincerity, we nonetheless conclude that the trial court should have stricken juror 89 for cause. Despite the earnest expression of beliefs and the good intentions of juror 89, we cannot accept that a parent who testified as a witness during his own daughter’s murder trial could not be influenced, albeit unintentionally, by such a painful and tragic experience.
Although these two jurors should have been stricken for cause, Smith is not entitled to relief because the failures here constituted harmless error. We have explained that “where a trial court has *861 awarded additional peremptory challenges to a defendant, each such additional challenge is treated as having replaced one that was expended on a juror who should have been but was not struck for cause.” Conde v. State, 860 So.2d 930, 942 (Fla. 2003). Accordingly, “[a] defendant cannot demonstrate prejudice if the trial court grants the same number of additional per-emptories as cause challenges that were erroneously denied.” Busby v. State, 894 So.2d 88, 97 (Fla.2004). The trial court here granted Smith three peremptory challenges in addition to the original ten challenges that he received. Thus, because the failure to strike jurors 29 and 89 constitutes harmless error, Smith is not entitled to relief.

E. Admission of Photographs

In his next challenge, Smith contends that the trial court erroneously admitted photos of the victim’s body. The standard of review for the admission of photographs is abuse of discretion. See Davis v. State, 859 So.2d 465, 477 (Fla. 2003). This Court has explained:
“The test for admissibility of photographic evidence is relevancy rather than necessity.” Crime scene photographs are considered relevant when they establish the manner in which the murder was committed, show the position and location of the victim when he or she is found by police, or assist crime scene technicians in explaining the condition of the crime scene when police arrived. This Court has upheld the admission of autopsy photographs when they are necessary to explain a medical examiner’s testimony, the manner of death, or the location of the wounds.
However, even where photographs are relevant, the trial court must still determine whether the “gruesomeness of the portrayal is so inflammatory as to create an undue prejudice in the minds of the jur[ors] and [distract] them from a fair and unimpassioned consideration of the evidence.” In making this determination, the trial court should “scrutinize such evidence carefully for prejudicial effect, particularly when less graphic photos are available to illustrate the same point.”
Douglas v. State, 878 So.2d 1246, 1255 (Fla.2004) (alterations in original) (citations omitted) (quoting Pope v. State, 679 So.2d 710, 713 (Fla.1996); Czubak v. State, 570 So.2d 925, 928 (Fla.1990); Marshall v. State, 604 So.2d 799, 804 (Fla.1992)). The admission of photographs will also be upheld if they are “corroborative of other evidence.” Czubak v. State, 570 So.2d 925, 928 (Fla.1990). At the same time, the admission of the photographs of a deceased victim also “must be probative of an issue that is in dispute.” Almeida v. State, 748 So.2d 922, 929 (Fla.1999). Nonetheless, we have also explained that “[t]hose whose work products are murdered human beings should expect to be confronted by photographs of their accomplishments.” Chavez v. State, 832 So.2d 730, 763 (Fla.2002) (quoting Henderson v. State, 463 So.2d 196, 200 (Fla.1985)). Finally, with regard to the impact of gruesome photos upon the jury, this Court has noted:
It is not to be presumed that gruesome photographs will so inflame the jury that they will find the accused guilty in the absence of evidence of guilt. Rather, we presume that jurors are guided by logic and thus are aware that pictures of the murdered victims do not alone prove the guilt of the accused.
Henderson, 463 So.2d at 200.
The record reflects that the trial court carefully considered each of the photographic exhibits and even requested that the State speak to Dr. Vega with regard to *862 the photos that he thought would best illustrate his testimony. See generally Philmore v. State, 820 So.2d 919, 932 (Fla. 2002) (trial court’s preliminary screening weighed in favor of admissibility). The trial court also excluded some photos that were proffered by the State. For example, the trial court admitted photo 53 to illustrate the testimony that the victim’s wrists were bound, but excluded photos 54 and 55. We consider the challenged photos based upon the purpose for their admission.
Exhibits Sk and 35A — These photos depict the body of the victim as she was discovered in the field behind the church. Exhibit 34 is a side view of the lower half of her body. Exhibit 35A, which is clearly the more graphic of the two, is a photo taken from the foot of the body and depicts the victim’s spread legs and exposed genitalia. The image reflects decomposition of, and insect larvae on, the body.
One of the disputed issues during trial was whether the victim was sexually battered. Dr. Vega testified that vaginal and anal swabs taken from the body tested negative for sperm. However, Dr. Vega explained that optimal testing was compromised by the presence of larvae and decomposition. These two exhibits were relevant to Dr. Vega’s testimony that the genitalia of Carlie had been affected by outside forces, which may have played a role with regard to the lack of evidence of a sexual battery. Therefore, we conclude that the trial court did not abuse its discretion when it admitted these photographs.
Exhibit J$ — This exhibit depicts the right calf of the victim, which exhibits prominent abrasions. Although animal predation on her ankle is visible, around this injury is larval activity. Dr. Vega utilized this exhibit to support his conclusion that the body had been dragged across a concrete-like surface before it was deposited in the field behind the church.[14] On cross-examination, Dr. Vega agreed that the positioning of the victim’s shirt (i.e., pushed up on the right side of her body with her right shirt sleeve pulled down off of her right shoulder) could have been caused by the dragging of the body, but that most likely her jeans and undergarments had been removed before she was dragged based on the uniformity of the abrasions on her legs. The uniformity and smoothness of these abrasions also led Vega to conclude that the dragging occurred while the victim was either unconscious or dead. Accordingly, exhibit 42 was admissible and relevant to illustrate Dr. Vega’s testimony with regard to the nature and extent of the injuries, and also to establish the manner of, and circumstances surrounding, the victim’s death. See Philmore, 820 So.2d at 931 (citing Jackson v. State, 545 So.2d 260, 265 (Fla. 1989); Wilson v. State, 436 So.2d 908, 910 (Fla.1983)); see also Engle v. State, 438 So.2d 803, 809 (Fla.1983) (noting that admitted color photos were “especially useful in showing the drag marks on the victim’s body”).[15]
*863 Exhibit 4.8 — This last contested exhibit depicts the inner thigh of the victim with two surgical incisions. Dr. Vega explained that when he first examined the body, he found what appeared to be a bruise on the inside of her thigh. He incised the skin in two places, and pooling of blood under the skin confirmed that at or around the time of death, she suffered a bruise to her inner thigh. Dr. Vega testified that such a bruise could have been caused by a struggle between the victim and her attacker. Although it is a graphic photo, we conclude that exhibit 48 was relevant to the conclusion of Dr. Vega that the body exhibited signs of blunt-force trauma. See Philmore, 820 So.2d at 931 (photographs admissible to illustrate injuries noted by the medical examiner).
Based on the foregoing considerations, we conclude that the trial court did not abuse its discretion with regard to the photographs.

F. Doubling of Aggravating Circumstances

Smith contends that the trial court improperly doubled the aggravating factors that the murder was committed during the course of a sexual battery upon a child under the age of twelve and that the victim of the murder was under the age of twelve. However, the State correctly notes that during trial proceedings, defense counsel contended that improper doubling with the victim-age aggravating circumstances would occur if the trial court also found and applied the aggravating factor that the murder was committed during the course of aggravated child abuse. Thus, defense counsel never asserted improper doubling based upon the sexual battery charged.[16] Smith contends for the first time on appeal that the application of the “committed during the course of a sexual battery upon a person under the age of twelve” and the “under the age of twelve” aggravating factors would constitute improper doublers. Therefore, the instant challenge is unpreserved and procedurally barred from appellate consideration. See Perez v. State, 919 So.2d 347, 359 (Fla.2005) (holding that for an issue to be preserved for appeal, the specific legal argument or ground to be argued on appeal must have been presented to the lower court), cert. denied, 547 U.S. 1182, 126 S.Ct. 2359, 165 L.Ed.2d 285 (2006).
However, even if defense counsel had asserted below that a determination and application of both of these aggravating circumstances would result in improper doubling, the position is without merit. We have previously explained:
Improper doubling occurs when both aggravators rely on the sam,e essential feature or aspect of the crime. Provence v. State, 337 So.2d 783, 786 (Fla.1976). However, there is no reason why the facts in a given case may not support multiple aggravating factors so long as they are separate and distinct aggrava-tors and not merely restatements of *864 each other, as in murder committed during a burglary or robbery and murder for pecuniary gain, or murder committed to avoid arrest and murder committed to hinder law enforcement.
Banks v. State, 700 So.2d 363, 367 (Fla. 1997) (emphasis supplied). As a result, “the focus in an examination of a claim of unconstitutional doubling is on the particular aggravators themselves, as opposed to whether different and independent underlying facts support each separate aggravating factor.” Sireci v. Moore, 825 So.2d 882, 885-86 (Fla.2002).
We conclude that these two aggravators are separate and distinct because one is based exclusively upon the age of the victim and the other is based upon the commission of a totally separate, different, and additional felony at the time of the murder (i.e., sexual battery), regardless of whether it is a child who is the victim of that contemporaneous felony. Indeed, to conclude that the “in the course of a sexual battery” aggravator cannot also be found and applied with the “under the age of twelve” aggravator would produce illogical results. The “committed in the course of a felony” aggravator lists numerous felonies to which it applies, including robbery, burglary, or arson. Under Smith’s interpretation, if a child dies while the defendant commits arson or a robbery, two aggrava-tors may be found and applied by the trial court, simply because the contemporaneous felony does not provide a specific reference to the age of a child. Conversely, a defendant who sexually batters and murders a child will only be subject to one statutory aggravator. Neither a jury nor a sentencing court should be precluded from considering as an aggravating circumstance that the murder occurred during the commission of a second violent felony simply because the defendant murdered a child and the additional felony includes an age component. Section 921.141(5)(d), Florida Statutes (2004), lists sexual battery — not sexual battery upon a child under the age of twelve — as a qualifying crime for application of this aggravating circumstance, and these two aggrava-tors are not “merely restatements of each other” and do not rely upon the “same essential feature or aspect of the crime.” Banks, 700 So.2d at 367. Accordingly, the trial court did not err when it found and applied both of these aggravators to the murder here. We deny relief on this claim.

G. Constitutionality of Section 921.1⅛1(5)(1), Florida Statutes (20(¼)

Smith next asserts that the statutory aggravating circumstance that the victim of the murder was under twelve years of age is unconstitutional. Smith contends that this circumstance is overinclusive and operates as an automatic aggravator because the statute requires neither that the defendant know the victim’s age nor that the State demonstrate that an age-based vulnerability played a role in the homicide. We disagree.
The instant challenge presents an issue of first impression because, although similar challenges have previously been asserted, this is the first case in which such an issue has been properly preserved. See Stephens v. State, 975 So.2d 405, 426 (Fla. 2007) (appellate counsel not ineffective for failure to challenge the constitutionality of section 921.141(5)(l) where trial counsel did not object during trial); Lukehart v. State, 776 So.2d 906, 925 (Fla.2000) (constitutional challenge to section 921.141(5)(0 procedurally barred where defendant failed to object during trial to the jury instruction on constitutional grounds). The constitutionality of a statutory aggra-vator is a pure question of law and is, therefore, subject to de novo review. See *865 Troy v. State, 948 So.2d 635, 643 (Fla. 2006).
We reject Smith’s constitutional challenge with regard to this aggravating circumstance. As argued by the State, this aggravator narrows the class of individuals who are subject to the death penalty because only a percentage of murder victims are under twelve years of age. See Francis v. State, 808 So.2d 110, 138 (Fla. 2001) (“[T]o be constitutional, an aggravating circumstance must ‘not apply to every defendant convicted of murder; it must apply only to a subclass of defendants convicted of murder.’ ” (quoting Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994))).
With regard to the contention that section 921.141(5)(l) violates due process because it does not require the State to establish that Smith targeted the victim based upon her age, this assertion is also without merit. In Woodel v. State, 804 So.2d 316, 325 (Fla.2001), this Court considered the constitutionality of section 921.141(5)(m), which establishes an aggravating circumstance for consideration when the victim of the capital felony is particularly vulnerable due to advanced age or disability. We previously upheld the constitutionality of this statute in Francis and further noted in Woodel that the finding of this aggravator is not dependent on whether the defendant has targeted his or her victim based on the age or disability of the victim. See 804 So.2d at 325. We similarly conclude that to find the existence of the “under twelve” aggravating circumstance, the State need not demonstrate that the defendant targeted the victim based upon her age. See also United States v. Minerd, 176 F.Supp.2d 424, 447 (W.D.Pa.2001) (rejecting claim that aggravator did not apply because defendant did not select the victim based upon her age where in “the plain language of the statute the aggravator refers to the age or physical characteristics of the victim, and not to whether she was targeted because of those qualities”).
Finally, although the “under twelve” aggravator does not expressly require that the victim be “particularly vulnerable,” the absence of these words in section 921.141(5)(Z) does not render this subsection constitutionally deficient. The Legislature has the discretion to deem all children under the age of twelve “vulnerable” and, at times, has even equated young children with vulnerable adults. See, e.g., §§ 39.9Q8(3)(b), Fla. Stat. (2008) (“[reporting suspected abuse of a child or a vulnerable adult as required by law”); 393.0673(1), Fla. Stat. (2008) (“The agency may revoke or suspend a license or impose an administrative fine ... if: ... (b) The Department of Children and Family Services has verified that the licensee is responsible for the abuse, neglect, or abandonment of a child or the abuse, neglect, or exploitation of a vulnerable adult.”); ch. 85-53, Laws of Fla. (preamble) (“WHEREAS, children are in need of special protection as victims or witnesses in the judicial system as a result of their age and vulnerability ....”); see also Leon v. State, 498 So.2d 680, 682 (Fla. 3d DCA 1986) (“All children under the age of twelve are, by definition, children of tender age who are particularly vulnerable to acts of child abuse.”). We hold that section 921.141(5)(Z) is constitutional.

H. Avoid Arrest Aggravating Circumstance

Smith asserts that the trial court erroneously found the existence of the avoid-arrest aggravating circumstance. According to Smith, the only evidence of Smith’s motivation were his statements to his brother John, which reflect that at the time of the murder he was under the *866 influence of drugs and scared and that the killing was an accident. Smith asserts that there may have been several motives for the murder, and that the State failed to establish that the sole or dominant motive was to avoid arrest.
The State is required to establish the existence of all aggravating circumstances beyond a reasonable doubt. See Geralds v. State, 601 So.2d 1157, 1163 (Fla.1992). Where the evidence in the case is entirely circumstantial, the State can satisfy the burden of proof only if the evidence is “inconsistent with any reasonable hypothesis which might negate the aggravating factor.” Id. “The standard of review applicable to this issue is whether competent, substantial evidence supports the trial court’s finding.” Conde v. State, 860 So.2d 930, 953 (Fla.2003).
This Court has described what must be demonstrated to satisfy the avoid arrest aggravator:
The avoid arrest/witness elimination aggravating circumstance focuses on the motivation for the crimes. See Jennings v. State, 718 So.2d 144, 151 (Fla.1998). Where the victim is not a police officer, “the evidence [supporting the avoid arrest aggravator] must prove that the sole or dominant motive for the killing was to eliminate a witness,” and “[mjere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator.” Consalvo v. State, 697 So.2d 805, 819 (Fla.1996); accord Gore v. State, 706 So.2d 1328, 1334 (Fla.1997). However, this factor may be proved by circumstantial evidence from which the motive for the murder may be inferred, without direct evidence of the offender’s thought processes. See Preston [v. State], 607 So.2d [404, 409 (Fla.1992)].
In other cases, this Court has found it significant that the victims knew and could identify their killer. While this fact alone is insufficient to prove the avoid arrest aggravator, see Consalvo, 697 So.2d at 819, we have looked at any further evidence presented, such as whether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant. See Jennings, 718 So.2d at 151.
Farina v. State, 801 So.2d 44, 54 (Fla.2001) (emphasis supplied). We have also explained that “the avoid arrest aggravator is proper where the victim is transported to another location and then killed.” Zile v. State, 748 So.2d 1012, 1027 (Fla.1999). Here, the trial court relied upon four factors to conclude that the State had established this aggravator: (1) Smith did not attempt to conceal his identity; (2) Smith removed the victim’s belongings, disposed of them, and then dragged her body to a wooded location; (3) Smith initially lied to Detective Davis with regard to his whereabouts on February 1, 2004; and (4) Smith abducted the victim from one location and transported her to another to commit the sexual battery. The trial court ultimately found that
[Smith’s] decision was not based on reaction or instinct, but was motivated solely by his decision to eliminate [Car-lie] as a witness. No doubt, [Smith] realized that if he were caught and convicted [of] kidnapping and capital sexual battery, he would spend the rest of his life in prison.
We need not address the substance of this claim because we conclude that even if we were to find that competent, substantial evidence does not support *867 this aggravator as asserted by Smith, any error is harmless. Even if we were to strike this aggravating factor on appeal, the harmless error test would be applied. The trial court expressly stated that any one of the aggravators found (except felony probation) was sufficient to outweigh the mitigating factors due to the totality of the aggravating factors that we uphold and affirm today. There is no possibility that any erroneous finding on this issue affected the sentence imposed. Smith is not entitled to a new penalty phase.

I. CCP Aggravating Circumstance

Smith next contends that the trial court erred when it found that the murder here was cold, calculated, and premeditated. This Court has explained that:
To support the CCP aggravator, a jury must find “that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), and that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification.”
Buzia v. State, 926 So.2d 1203, 1214 (Fla. 2006) (quoting Jackson v. State, 648 So.2d 85, 89 (Fla.1994)). We have previously recognized that “[s]imple premeditation of the type necessary to support a conviction for first-degree murder is not sufficient to sustain a finding that a killing was committed in a cold, calculated, and premeditated manner.” Holton v. State, 573 So.2d 284, 292 (Fla.1990). Moreover, “[t]he premeditation of a felony cannot be transferred to a murder which occurs in the course of that felony for purposes of [CCP]. What is required is that the murderer fully contemplate effecting the victim’s death.” Geralds, 601 So.2d at 1163 (quoting Hardwick v. State, 461 So.2d 79, 81 (Fla.1984)). CCP may be established by such facts as “advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.” Swafford v. State, 533 So.2d 270, 277 (Fla.1988).
Here, the trial court based its finding of this aggravator on two purely circumstantial factors: (1) the kidnapping and sexual battery were deliberate acts planned by Smith; and (2) Dr. Vega testified that death by strangulation can take minutes to effect, and during the time that Smith held the ligature around the victim’s neck, Smith had adequate time to reflect. According to the trial court, “as each moment passed, he made a conscious choice to slowly and methodically deprive her body of the blood and air necessary to sustain life.” Because the facts of this case support another reasonable hypothesis that is inconsistent with this aggravator, we conclude that the State failed to establish beyond a reasonable doubt that this murder was cold, calculated, and premeditated.
The facts reflect that the abduction of Carlie was a spontaneous decision. Smith confided to his brother, John, on multiple occasions that he had never met the victim before. Accordingly, Smith could not have known that Carlie would be walking home alone that day without permission. Although Smith may have kidnapped her from the car wash with the intent to sexually batter her, there is no indication that at the time of the abduction he was planning to kill her. Cf. Geralds, 601 So.2d at 1163-64 (CCP aggravator rejected where defendant planned to burglarize the victim’s home but evidence supported a reasonable hypothesis that defendant killed the victim in sudden anger). In the instant case, an equally if not more plausible explanation for the killing is that after *868 Smith battered this child, he panicked due to what he had done and he therefore strangled her. The latter scenario fails to present the careful and calm reflection that is required for the killing to qualify as “cold.” See Holton, 573 So.2d at 292 (rejecting CCP aggravator when “[t]he strangulation murder occurred during another crime, sexual battery, and could have been a spontaneous act in response to the victim’s refusal to participate in consensual sex”); Harmon v. State, 527 So.2d 182, 188 (Fla.1988) (rejecting CCP aggravator when murder happened during the commission of a robbery and the defendant became frightened when the victim said his name).
Moreover, while the ligatures used to bind and strangle the victim were never found, the record reflects that at the time of the abduction, Smith was not driving his own vehicle. Thus, when he made what appears to be the spontaneous decision to kidnap Carlie, he obtained whatever was available within the vehicle to bind her and eventually kill her. Thus, unlike the cases that the State relies upon in support of the CCP aggravating circumstance, it appears that Smith did not procure the murder weapon in advance. See Ibar v. State, 938 So.2d 451, 458 (Fla.2006) (defendant went to his house and retrieved a firearm before travelling to the locations where the murders occurred); Hertz v. State, 803 So.2d 629, 635 (Fla.2001) (evidence reflected that at the time the defendant approached the victims’ home, he and his codefendants were armed with guns); cf. Geralds, 601 So.2d at 1164 (no CCP where the defendant used a knife from the victim’s kitchen rather than one brought to the scene).
Moreover, unlike the cases upon which the State relies, there is no clear indication from the record that Smith had a window of time in which he “coldly and calmly decide[d] to kill.” Ibar, 938 So.2d at 473-74 (CCP proper where the victims were bound and one of the victims was- beaten for more than twenty minutes before the murder); Hertz, 803 So.2d at 650 (victims were bound and gagged for two hours before the murders); Wike v. State, 698 So.2d 817, 822 (Fla.1997) (after sexually battering one of the victims, the defendant drove both victims to another location and forced them walk into the woods, where he slit their throats). In light of the foregoing, we hold that competent, substantial evidence does not support the finding of this aggravator.
When this Court strikes an aggravating factor on appeal, the harmless error test is applied to determine whether there is a reasonable possibility that the error affected the sentence. See Jennings v. State, 782 So.2d 853, 863 n. 9 (Fla.2001); see also Douglas v. State, 878 So.2d 1246, 1268 (Fla.2004) (“Striking [an] aggravator necessitates a harmless error analysis.”). We conclude that the erroneous finding of the CCP aggravator here was harmless because the trial court expressly stated in the sentencing order that any one of the aggravators found (except the felony probation aggravator) was sufficient to outweigh the mitigating circumstances found in this case and due to the other applicable aggravating factors. There is no reasonable possibility that the erroneous finding of CCP affected the sentence that was imposed by the trial court. Accordingly, Smith is not entitled to a new penalty phase.

J. Testimony of Smith’s Mother and Sister

Both Smith’s sister and mother expressed a desire to testify during the penalty phase. Defense counsel proffered that Smith’s mother could testify to numerous elements of mitigation, and Smith’s sister sought to read a letter that she had written. The State countered that such *869 testimony or statements would “open the door” to cross-examination about the fact that Smith allegedly had sexual contact with his sister when she was thirteen and he was seventeen, and that the mother sent Smith to live with his aunt when she learned from her daughter about the sexual contact. The trial court agreed that if these witnesses were called, they would be subject to cross-examination to “show the entire picture” with regard to Smith’s pri- or actions. Smith ultimately chose not to present either witness. Smith now contends that the ruling of the trial court constituted an abuse of discretion because, had the sister and mother been cross-examined with regard to the alleged sexual conduct between Smith and his sister, the unfair prejudice of this testimony would have substantially outweighed its probative value. See § 90.403, Fla. Stat. (2004).
Trial court rulings on eviden-tiary issues are reviewed under the abuse of discretion standard. See Salazar v. State, 991 So.2d 364, 373 (Fla.2008), cert. denied, -U.S.-, 129 S.Ct. 1347, 173 L.Ed.2d 614 (2009). The State correctly notes that during the trial proceeding, defense counsel contended that the evidence of sexual conduct between Smith and his sister should not be disclosed because it was irrelevant to the instant proceeding. For the first time on appeal, Smith now contends that while this evidence may be relevant, the relevance is far outweighed by its prejudicial value and therefore should be excluded pursuant to section 90.403, Florida Statutes. Accordingly, this challenge in unpreserved and, therefore, procedurally barred for appellate consideration. See Perez, 919 So.2d at 359.
However, even if defense counsel had preserved this challenge below, we conclude that Smith would not be entitled to relief because the trial court did not abuse its discretion. This Court has explained that
the State “shall be provided a full opportunity to rebut the existence of mitigating factors urged by [the defendant] ... and to introduce evidence tending to diminish their weight if they cannot be rebutted.” We usually allow the State to rebut the mitigation offered by the defense, and we allow the defense to offer evidence to rebut aggravation proposed by the State.
Kormondy v. State, 845 So.2d 41, 51-52 (Fla.2003) (citation omitted) (quoting Ellis v. State, 622 So.2d 991, 1001 (Fla.1993)).
During the penalty phase, Smith presented the testimony of various witnesses who testified positively as to Smith’s relationship with his family. Smith’s aunt testified that Smith is her godchild; that he was more of a son to her than a nephew; that he played with her son every day as the two grew up; that he attended family functions; that he was the best man at her son’s wedding; and that when her husband passed away, Smith helped her, and she could not have made it through that time without him. Smith’s cousin testified that she and Smith were more like siblings than cousins because they did everything together. She testified that Smith was always around to help her mother after her father died. The cousin also identified photographs of Smith with his sister feeding a baby lamb and Smith with other family members at his sister’s communion.
This evidence was presented to demonstrate that Smith was a loving family member and that he maintained positive relationships with them. We agree with the State that this evidence “opened the door” for the presentation of evidence that rebutted the portrayal of Smith as an ideal family member. Indeed, to prohibit cross-examination of Smith’s mother and sister would operate to deceive the jury. The *870 defense does not dispute that Smith engaged in sexual conduct with his then thirteen-year-old sister and was subsequently forced to leave his home and live with his aunt as a result of this conduct. If the court had permitted Smith to present witnesses to demonstrate that Smith was a good brother, nephew, and cousin, but then protected those witnesses from cross-examination with regard to the darker elements of Smith’s childhood, the State would have been erroneously precluded from rebutting mitigation evidence. See Kormondy, 845 So.2d at 51-52. This also would have presented a skewed portrait of Smith to the jury. Therefore, although the trial court’s decision not to allow Smith’s mother or sister to testify without being subject to cross-examination may have strategically precluded some mitigation evidence from being presented during the penalty phase, we cannot conclude that the trial court’s evidentiary ruling on this sensitive issue constituted an abuse of discretion.

K. Allocution Before the Jury

During the penalty phase, the jury submitted the following question to the trial court: “Is it within the realm of possibility to consider a sentence based on allocution to the crime?” Smith prepared a written statement and asked to make a statement of allocution to the jury in response to its question without being subject to cross-examination by the State. The trial court denied this request, and Smith challenges this ruling.
Smith concedes that the Court rejected a similar claim in Troy v. State, 948 So.2d 635 (Fla.2007); however, he notes one factual difference — here, the jury was sophisticated enough be aware of allocution and may have expected Smith to make a statement of remorse. According to Smith, when the jurors did not receive allocution, they may have believed that Smith had no remorse for what he had done. Smith contends that the ruling of the trial court deprived him of a fair penalty phase and due process of the law.
In Troy v. State, we held that the trial court did not err when it denied a capital defendant the opportunity to provide an allocution statement before the jury without being subject to cross-examination. In our analysis, we explained:
Spencer outlines the proper sentencing phase procedure to be followed in death cases; it also emphasizes the role of the circuit judge over the trial jury in the decision to impose a sentence of death:
First, the trial judge should hold a hearing to: a) give the defendant, his counsel, and the State, an opportunity to be heard; b) afford, if appropriate, both the State and the defendant an opportunity to present additional evidence; c) allow both sides to comment on or rebut information in any presen-tence or medical report; and d) afford the defendant an opportunity to be heard in person. Second, after hearing the evidence and argument, the trial judge should then recess the proceeding to consider the appropriate sentence. If the judge determines that the death sentence should be imposed, then, in accordance with section 921.141, Florida Statutes ... the judge must set forth in writing the reasons for imposing the death sentence. Third, the trial judge should set a hearing to impose the sentence and contemporaneously file the sentencing order. Such a process was clearly not followed during these proceedings.
[[Image here]]
615 So.2d at 690-91 (emphasis added)....
In Johnson v. State, 608 So.2d 4 (Fla. 1992), this Court rejected the defen *871 dant’s claim that a videotape he made expressing remorse should have been shown to the jury. Id. at 10. At trial, the trial judge denied this request, agreeing with the prosecution that it would enable the defendant to escape cross-examination by not testifying in person. Id. This Court agreed with the trial court’s decision to exclude the videotape, concluding,
“All witnesses are subject to cross-examination for the purpose of discrediting them by showing bias, prejudice or interest.” Jones v. State, 385 So.2d 132, 133 (Fla. 4th DCA 1980). Johnson could have made this plea to the judge, the sentencer, and we find no error in refusing to let the jury hear his self-serving statement.
Johnson, 608 So.2d at 10. We reaffirm our holding in Johnson here.
Troy, 948 So.2d at 648-49.
In the instant case, consistent with Troy, Smith was allowed to make an allocution statement during the Spencer hearing. Accordingly, the trial court properly denied Smith’s request, and relief on this claim is not warranted.[17]

L. Constitutionality of Section 775.051, Florida Statutes (2004.)

Under this challenge, Smith contends that section 775.051, Florida Statutes (2004), which abolished the defense of voluntary intoxication under certain circumstances, violates due process.[18] Smith asserts that section 775.051 is fundamentally different from the voluntary-intoxication-defense abolishment statute upheld by the United States Supreme Court in Montana v. Egelhoff, 518 U.S. 37, 116 S.Ct. 2013, 135 L.Ed.2d 361 (1996), because the Montana statute removed voluntary intoxication across the board from the mens rea inquiry, thereby redefining the mental state for the committed offense. On the other hand, the Florida statute precludes the defense based upon the substance consumed. Thus, according to Smith, section 775.051 does not amount to a redefinition of the mental-state element of specific-intent criminal offenses as did the Montana statute. Rather, the statute unconstitutionally prohibits most, but not all, voluntarily intoxicated defendants from introducing evidence to negate the requisite mental state for commission of an offense.
In Egelhoff, the United States Supreme Court upheld a statute, see 518 U.S. at 56, 60, 116 S.Ct. 2013, which provided that voluntary intoxication “may not be taken into consideration in determining the existence of a mental state which is an element of [a criminal] offense.” 518 U.S. at 39-40, *872 116 S.Ct. 2013 (plurality opinion). In reaching this determination, the plurality noted that under old English and early American law, defendants were precluded from arguing that, due to intoxication, they could not have possessed the mens rea required to commit the crime. See id. at 44, 116 S.Ct. 2013. The plurality noted that an exception to this common-law rule had been created in more recent years: “[B]y the end of the 19th century, in most American jurisdictions, intoxication could be considered in determining whether a defendant was capable of forming the specific intent necessary to commit the crime charged.” Id. at 47, 116 S.Ct. 2013.
However, the plurality concluded that this exception had not become so deeply rooted in the tradition or conscience of our society as to qualify as a fundamental principle of justice, such that the decision of a state to abolish the exception would be “subject to proscription under the Due Process Clause.” Id. at 43, 116 S.Ct. 2013 (quoting Patterson v. New York, 432 U.S. 197, 201-02, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977)). Accordingly, the plurality held that “[t]he people of Montana have decided to resurrect the rule of an earlier era, disallowing consideration of voluntary intoxication when a defendant’s state of mind is at issue. Nothing in the Due Process Clause prevents them from doing so.” Id. at 56, 116 S.Ct. 2013.
As with the allocution issue, this Court in Troy considered and rejected a claim that section 775.051 violates due process. In Troy, we adopted the analyses of two Florida district courts that rejected constitutional challenges to section 775.051 and relied on Egelhoff in their analyses:
In Florida, two appellate decisions have addressed and upheld the constitutionality of section 775.051. See Barrett v. State, 862 So.2d 44 (Fla. 2d DCA 2003); Cuc v. State, 834 So.2d 378 (Fla. 4th DCA 2003). In Cuc, the defendant alleged that she was denied her right to due process of law under section 775.051 because she was not allowed to raise a defense of voluntary intoxication. 834 So.2d at 378. In affirming her conviction, the Fourth District noted that the statute at issue in Florida was similar to the one upheld in Egelhoff. Id. ...
In the case before the Second District, Barrett was convicted of first-degree murder; on appeal, he argued that section 775.051 “improperly excludes a class of relevant evidence and lessens the State’s burden to prove his guilt beyond a reasonable doubt.” Barrett, 862 So.2d at 45. Barrett conceded that the Florida statute was similar to the statute upheld in Egelhoff, but he argued that Florida’s Constitution provides stronger due process protections than does the United States Constitution. Id. at 47, 518 U.S. 37, 116 S.Ct. 2013. The Second District disagreed, holding that “there is no basis to conclude that the Florida Constitution provides greater protections to Barrett than does the United States Constitution in relation to the elimination of voluntary intoxication as a defense to a criminal offense.” Id. at 48, 518 U.S. 37, 116 S.Ct. 2013.
The Barrett court also considered whether section 775.051 effects a “substantive change to the mens rea element of criminal conduct or is simply a rule of evidence.” Id. at 48. The court found that, based on this Court’s precedent in State v. Garcia, 229 So.2d 236, 238 (Fla. 1969), and Caple v. Tuttle's Design-Build, Inc., 753 So.2d 49, 53 (Fla.2000), the change is substantive, in line with Egelhoff:
Substantively, section 775.051 addresses the mens rea element of criminal offenses by stating that voluntary intoxication is not a defense to crimi *873 nal conduct and cannot be used to show that the defendant lacked the specific intent to commit a crime. This is consistent with the State’s interest in making persons who voluntarily become intoxicated responsible for their behavior. See Egelhoff, 518 U.S. at 49-50, 116 S.Ct. 2018. However, the statute also addresses procedural matters by excluding, at trial, evidence of voluntary intoxication.
Although section 775.051 has both substantive and procedural elements, this does not render the statute constitutionally infirm when the procedural provisions “are intimately related to the definition of those substantive rights.” See Caple, 758 So.2d at 54. As was the case with the Montana statute under Justice Ginsburg’s analysis, section 775.051 effects a substantive change in the definition of mens rea, and it is not simply an evidentiary rule. See Egelhoff, 518 U.S. at 57-60, 116 S.Ct. 2013.
Barrett, 862 So.2d at 48 (parallel citations omitted). We find the reasoning and conclusions in Cuc and Barrett to be sound and we adopt that reasoning as our own.
948 So.2d at 644-45. Thus, we have previously determined that section 775.051 does not violate due process.
To the extent Smith contends that the statute violates due process (or possibly equal protection) because it allows individuals who ingest illicit substances that are not listed in chapter 893, Florida Statutes (2004), to utilize a defense of voluntary intoxication, this challenge is unpre-served and, therefore, procedurally barred. See Perez, 919 So.2d at 359. The record reflects that Smith did not assert this specific legal challenge before the trial court. The only disparate-treatment contention that Smith argued below was that the statute violates equal protection because it allows a voluntary intoxication defense to be utilized when the person ingests a controlled substance pursuant to a medical prescription, but does not allow the defense for individuals who ingest drugs without a valid prescription. An identical equal-protection claim was decided adversely to Smith in Troy. See 948 So.2d at 645. Accordingly, relief is not warranted on this claim.

M. Challenges pursuant to Ring v. Arizona

In Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United States Supreme Court invalidated sentencing schemes where the trial court was responsible for (1) the finding of an aggravating circumstance which rendered a defendant eligible for the death penalty, and (2) the ultimate decision to impose a death sentence. According to Smith, Florida constitutes a “judge-sentencing” state and, therefore, its sentencing scheme violates the Sixth Amendment.
Smith’s claim is without merit. This Court has repeatedly held that Florida’s capital sentencing scheme does not violate the United States Constitution under Ring. See, e.g., Gore v. State, 964 So.2d 1257, 1276-77 (Fla.2007); Hannon v. State, 941 So.2d 1109, 1147 (Fla.2006); Jones v. State, 845 So.2d 55, 74 (Fla.2003). Further, in Owen v. Crosby, 854 So.2d 182, 193 (Fla.2003), this Court rejected a Ring challenge where the trial court found as an aggravating circumstance that the defendant committed the murder during the commission of a burglary or sexual battery. In reaching this determination, the Court noted that this particular aggravator “involve[s] circumstances that were submitted to a jury and found to exist beyond a reasonable doubt.” Id.
*874 In the instant case, a jury convicted Smith of sexual battery upon a child less than twelve years of age and kidnapping. Since the jury determined beyond a reasonable doubt that Smith committed these crimes, Smith’s Ring challenge is without merit on this additional basis. Accordingly, this claim is denied.

N. Sufficiency

Even if a defendant has not specifically presented a sufficiency challenge, this Court has an independent obligation to review the record to determine whether sufficient evidence exists to support a conviction. See Overton v. State, 801 So.2d 877, 905 (Fla.2001); Fla. R.App. P. 9.142(a)(6). Here, the record evidence is sufficient to affirm Smith’s convictions on each of the charged crimes. Carlie’s kidnapping was captured on a video recording and, during trial, her stepfather testified that neither he nor her mother gave anyone permission to take custody of her on February 1, 2004. Smith subsequently confessed that he forced the victim to engage in sexual conduct and that he strangled her after “rough sex.” Smith informed his brother John where victim’s body could be found, and John led law enforcement agents to that location. Hair and fibers consistent with that of the victim were found in the yellow station wagon which was in Smith’s borrowed possession on the night of the crimes. The child was found naked from the waist down, and semen which was found on the back of the shirt she was wearing at the time of her abduction and murder contained DNA that matched Smith. Finally, the record reflects that Smith admitted to his brother that he dragged the body of Carlie into the field behind the church and disposed of her personal belongings in four different dumpsters.

0. Proportionality

As with sufficiency of the evidence, even if a defendant does not challenge the proportionality of the death sentence, this Court has an independent obligation to review each case to ensure that death is the appropriate punishment. See Philmore v. State, 820 So.2d 919, 939 (Fla.2002); Fla. R.App. P. 9.142(a)(6). When we conduct a proportionality analysis, the totality of the circumstances should be considered and the matter should be considered in relation to other capital cases. See Nelson v. State, 748 So.2d 237, 246 (Fla.1999). This comparison, however, is not to be made as to the number of aggravating and mitigating circumstances found. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). Additionally, the death penalty is “reserved only for those cases where the most aggravating and least mitigating circumstances exist.” Terry v. State, 668 So.2d 954, 965 (Fla.1996).
In the instant matter, the jury recommended the death penalty by a vote of ten to two. The trial court found this recommendation appropriate after weighing the statutory aggravating circumstances with the mitigating circumstances. In imposing the death sentence, the trial court found five statutory aggravators (not including the stricken CCP aggravator): (1) Smith committed the felony while he was on probation (moderate weight); (2) the murder was committed while Smith was engaged in the commission of a sexual battery or kidnapping (significant weight); (3) the murder was committed for the purpose of avoiding lawful arrest (great weight); (4) HAC (great weight); and (5) the victim was under twelve years of age (great weight). The trial court also found thirteen nonstatutory mitigating circumstances.
*875 After reviewing the totality of the circumstances and considering the striking of the CCP aggravating circumstance, we conclude that the instant matter is proportional based on other cápital cases in which this Court has upheld the death penalty. We have repeatedly affirmed the death penalty where the defendant has kidnapped, sexually battered, and murdered a child victim. In Davis v. State, 698 So.2d 1182 (Fla.1997), this Court affirmed the imposition of a death sentence where the defendant entered the home of his, ex-girlfriend, removed the ex-girlfriend’s eleven-year-old daughter, transported her to his trailer, digitally penetrated her, and then strangled her. See id. at 1186-87. In aggravation, the trial court found that Davis was under a sentence of imprisonment; the murder was committed in the course of a kidnapping and sexual battery; the murder was committed for the purpose of avoiding arrest; and HAC. See id. at 1187. The trial court found one statutory mitigating circumstance — that the murder was committed while Davis was under the influence of extreme mental or emotional disturbance — and accorded this factor great weight. See id. The trial court also found a number of nonstatutory mitigating circumstances:
Davis was capable of accepting responsibility for his actions and had shown remorse for his conduct and offered to plead guilty; that he had exhibited good behavior while in jail and prison; that he had demonstrated positive courtroom behavior; that he was capable of forming positive relationships with family members and others; that he had no history of violence in any of his past criminal activity; that he did not plan to kill or sexually assault the victim when he began his criminal conduct; that he cooperated with police, confessed his involvement in the crime, did not resist arrest, and did not try to flee or escape; that he had always confessed to crimes for which he had been arrested in the past, accepted responsibility, and pled guilty; that he had suffered from the effects of being placed in institutional settings at an early age and spending a significant portion of his life in such settings; and that Davis obtained his GED while in prison and participated in other self-improvement programs.
Id.; see also Chavez v. State, 832 So.2d 730, 767 n. 44 (Fla.2002) (death sentence affirmed where defendant kidnapped, sexually battered, and strangled nine-year-old victim; in aggravation, trial court found HAC, the murder was committed while the defendant was engaged in a kidnapping, and the murder was committed to avoid lawful arrest; trial court found six mitigating circumstances but held that “the strength of the aggravating circumstances in this case are so overwhelming that they make the mitigating circumstances appear insignificant by comparison”); Carroll v. State, 636 So.2d 1316, 1319 (Fla.1994) (death sentence affirmed where defendant sexually battered and strangled ten-year-old victim; in aggravation, trial court found HAC, the murder was committed while the defendant was engaged in a sexual battery, and the defendant had previously been convicted of two prior violent felonies; trial court found no statutory mitigation but found that the defendant suffered from “some possible mental abnormalities and has an antisocial personality”).
Here, the trial court found the same aggravators as in Davis plus the “victim under the age of twelve” aggravator.[19] *876 Particularly compelling in this proportionality analysis is the trial court’s finding with regard to HAC:
Carlie endured unspeakable trauma, which began at the time of her kidnapping at Evie’s. Because of the surveillance cameras, Carlie’s abduction was literally caught on tape. The image of the Defendant taking her by the arm and leading her away will, no doubt, forever be etched in our minds. Because of the forensic evidence, we know the truth of what Carlie experienced thereafter.
From Evie’s, Carlie was transported to at least one location, possibly more, and subjected to demeaning and cruel acts including the binding of her hands, the removal of her clothes and being forced to engage in various sex acts by a man nearly four times her age and double her size. During those acts, Carlie was unable to fight back. At eleven years of age, there is no doubt she was aware of her dire predicament and that she had little, if any, hope of survival.
Any hope of survival Carlie may have clung to faded once the Defendant placed the ligature around her neck. At this time, Carlie was conscious, but clearly in no position to fight back. Perhaps worst of all, Carlie knew she was going to die. Although this Court may never know exactly how long it took for Carlie to be rendered unconscious once the defendant placed the ligature around her neck, this child had already suffered unspeakable terror and physical suffering at the Defendant’s hands.
The trial court here found no statutory mitigating circumstances. While the trial court did find thirteen nonstatutory mitigating circumstances, a number of them were accorded little weight. As in Chavez, the mitigation found by the trial court in this case was insignificant in comparison to the established aggravation. Accordingly, we hold that the imposition of death for the murder of Carlie is proportionate, and we affirm the sentence.
III. CROSS-APPEAL
The State filed a pretrial motion seeking a determination that Smith’s 1993 aggravated battery charge should be used to establish the “prior violent felony conviction” aggravating circumstance. The trial court relied upon this Court’s decision in Garron v. State, 528 So.2d 353 (Fla.1988), and held that this aggravator did not apply because Smith pled no contest to the aggravated battery charge and adjudication was withheld. In Garrón, we struck the “prior violent felony” aggravator under identical circumstances. Our analysis provided:
In McCrae v. State, 395 So.2d 1145 (Fla. 1980), cert. denied, 454 U.S. 1041, 102 S.Ct. 583, 70 L.Ed.2d 486 (1981), this Court upheld that aggravating factor because there was a guilty plea but no adjudication of guilt. In that case we recognized that a valid guilty plea should be considered a “conviction” for capital sentencing proceedings. The Court reasoned that the guilty plea is more than a confession; it is a conviction. In the present case, however, the prior “conviction” lacks a guilty plea. Under the McCrae analysis, the plea of guilty is an absolute condition precedent before the lack of adjudication can be considered a conviction. Here, appellant pled nolo contendere to the aggravated assault charge and received no adjudication of guilt. It does not follow from McCrae that a plea of nolo conten-dere amounts to either a confession of guilt or a “conviction” for purposes of capital sentencing proceedings. A nolo plea means “no contest,” not “I confess.” It simply means that the defendant, for whatever reason, chooses not to contest *877 the charge. He does not plead either guilty or not guilty, and it does not function as such a plea. None of the factors which go toward evidencing a conviction are present in this case, therefore, the first aggravating factor must fail.
528 So.2d at 360 (emphasis supplied) (citation omitted).
The State contends on cross-appeal that the ruling of the trial court was erroneous because Garrón was statutorily abrogated by the Legislature’s 1993 adoption of a broader definition for the word “conviction” as that term is used in chapter 921, Florida Statutes (2008), which governs sentencing. In support of this contention, the State relies upon Montgomery v. State, 897 So.2d 1282, 1286 (Fla.2005), in which this Court held, in the context of sentencing guidelines, that the statutory definition of “conviction” in section 921.0021, Florida Statutes (2002), includes those felonies to which a defendant pled no contest, regardless of whether adjudication was withheld.
A review of the legislative history of the definition of “conviction” leads us to conclude that the Legislature did not intend for the definition in section 921.0021, Florida Statutes (2003), to apply to the “prior violent felony conviction” aggravator. See generally § 921.002(1), Fla. Stat. (2008) (“The provision of criminal penalties and of limitations upon the application of such penalties is a matter of predominantly substantive law and, as such, is a matter properly addressed by the Legislature.”); State v. J.M., 824 So.2d 105, 109 (Fla.2002) (“[LJegislative intent is the polestar that guides a court’s statutory construction analysis.”).
In 1993, the Florida Legislature adopted section 921.0011(2), Florida Statutes (2008), which defined “conviction” as “a determination of guilt that is the result of a plea or a trial, regardless of whether adjudication is withheld.” See ch. 93-406, § 9, at 2924, Laws of Fla. The session law provided that the definitions under section 921.0011 applied to the entire chapter. See id. (“921.0011 Definitions — As used in this chapter-”). Chapter 921, entitled “Sentence,” included section 921.141(5)(b), which provides as an aggravating circumstance that “[t]he defendant was previously convicted of another capital felony or of a felony involving the use or threat of violence to the person.” Thus, under the plain language of section 921.0011, the 1993 definition of “conviction” applied to section 921.141(5)(b), and a plea, regardless of whether adjudication was withheld, constituted a conviction.
In 1997, section 921.0011 was repealed and renumbered as section 921.0021. See ch. 97-194, §§ 1, 4, at 3674-75, Laws of Fla. While renumbered, section 921.0021 still indicated in 1997 that it applied to the whole of chapter 921. See ch. 97-194, § 4, at 3675, Laws of Fla. (“As used in this chapter ... (2) “Conviction” means a determination of guilt that is the result of a plea or a trial, regardless of whether adjudication is withheld.”). In 1998, however, the Legislature expressly limited this section to noncapital felonies:
As used in this chapter, for any felony offense, except any capital felony, committed on or after October 1, 1998, the term ... (2) “Conviction” means a determination of guilt that is the result of a plea or a trial, regardless of whether adjudication is withheld.
Ch. 98-204, § 3, at 1937-38, Laws of Fla. (emphasis supplied). In Montgomery v. State, 897 So.2d 1282, 1285-86 (Fla.2005), we subsequently held that, under the statutory definition of “conviction” provided in section 921.0021, a no contest plea with adjudication withheld constituted a conviction for purposes of the sentencing guide *878 lines, which do not apply to capital felonies.
The specific decision of the Legislature in 1998 to limit section 921.0021 to noncapital felonies demonstrates that it did not intend for the broader definition of the word “conviction” to apply to the “pri- or violent felony” aggravating circumstance in capital cases. See State v. Mark Marks, P.A., 698 So.2d 533, 541-42 (Fla. 1997) (“When the legislature amends a statute, we presume it intended the statute to have a different meaning than that accorded it before the amendment.”). Accordingly, the trial court properly denied the State’s request to utilize Smith’s 1993 aggravated battery charge to establish the “prior violent felony” aggravator.
IV. CONCLUSION
Based upon the foregoing analyses and considerations, we affirm Smith’s convictions and sentences.
It is so ordered.
QUINCE, C.J., and PARIENTE and LEWIS, JJ., concur.
CANADY, J., concurs in result with an opinion, in which POLSTON, J., concurs.
LABARGA and PERRY, JJ., did not participate.

.The yellow station wagon became relevant to the investigation because when the proprietor subsequently reviewed the images captured on other cameras that were stationed at the car wash, he discovered that a camera which faced Bee Ridge Road recorded a yellow station wagon at 6:18 p.m. on February 1, 2004 (approximately three minutes before the abduction). A second camera captured that station wagon driving through the parking lot of the car wash. As previously noted, Carlie Brucia was abducted from the car wash at approximately 6:21 p.m. that day.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694(1966).

. The SCSO requested and received assistance from the FBI with regard to the abduction case.

. When Carlie left her girlfriend’s house on February 1, she was carrying a pink vinyl backpack, which had not been located.

. Dr. Vega examined photos that were taken of Smith after he was arrested for violation of probation. Dr. Vega testified that an injuiy on one of Smith’s fingers was consistent with the type of injury that would be caused by friction from the rubbing of a cord against the side of a finger during manual strangulation. However, Dr. Vega emphasized that he could not determine if that was in fact the cause of Smith’s injury.

. Dr. Vega testified that a large bruise on the inside of Smith’s knee, which had been photographed after his arrest on the probation violation, could have been caused by a struggle with another person (i.e., a kick).

. A doctor certified in addiction medicine who reviewed Smith's treatment history was of the opinion that certain entities that treated Smith failed to implement a coordinated plan to address all of Smith’s health issues — i.e., pain, depression, and addiction. The doctor explained that she did not discuss the details of the crimes with Smith, including whether he was on drugs that night and, if so, what type. Accordingly, she had no opinion with regard to Smith's level of intoxication on the night of the murder.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The trial court noted that even though the murder was committed during the commission of two separate crimes, the court considered this aggravating circumstance only once, and no doubling occurred.

. Specifically, the trial court found that there was no evidence presented to support the mitigating circumstances that Smith was under extreme mental or emotional disturbance during the commission of these crimes or that Smith’s capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired. See § 921.141(6)(b),(f), Fla. Stat. (2003). In support of this finding, the trial court noted that on the day of the crimes, at approximately 8:15 p.m. (i.e., after the murder), Smith visited the home of an acquaintance where they discussed repairs to a vehicle for approximately thirty-five to forty-five minutes.

.The trial court concluded that the timing of certain admissions “supports [the] finding that [Smith] attempted to use his mental health and drug abuse problems to achieve the desired outcome of avoiding prison and rallying his family around him.”

. The recent decision of the United States Supreme Court in Melendez-Diaz v. Massachusetts, - U.S. -, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), does not impact our holding today. In fact, the Supreme Court concluded that our decision in Johnson with regard to the Confrontation Clause was consistent with its holding in Melendez-Diaz. See id. at 2540 n. 11. In Melendez-Diaz, the analysts who conducted the tests that led to the conclusion that the defendant possessed cocaine did not testify during trial — instead, only affidavits which reported the results of the testing were introduced. We conclude that the present case is distinguishable from and not controlled by Melendez-Diaz because, as previously noted, the FBI team supervisor who interpreted the data, formulated the conclusions, and prepared the report that implicated Smith in the sexual battery actually testified during trial.

. Because of the high-profile nature of this case, the jurors were referenced by number throughout the trial.

. Vega explained to the jury that the injury to Carlie’s ankle was most likely caused by animal predation and not by her attacker.

. We agree with Smith, however, that it was improper for the prosecutor during closing penalty-phase statements to contend that Smith should receive the death penalty because he left the body "exposed to animals, predators in the woods." Such a comment was not relevant to establish the method of death, but instead was intended to inflame the emotions of the jury. Defense counsel did not object to this statement; therefore, absent fundamental error, Smith is not entitled to relief based upon improper commentary. See Morton v. State, 789 So.2d 324, 329 (Fla. 2001). We conclude that the reference to animal predation does not reach into the va *863 lidity of the trial to the extent that a jury recommendation of death could not have been obtained without this statement. See id. However, we again remind prosecutors that closing statements "must not be used to inflame the minds and passions of the jurors so that their verdict reflects an emotional response to the crime or the defendant.” Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985).

. In fact, during the penalty phase, the trial court asked the parties if there would be a doubling concern with regard to the "victim under the age of twelve” and the "during the course of a sexual battery on a child under the age of twelve” aggravating circumstances, and the State responded, "No sir, I have not seen that as an issue on those two aggrava-tors.” Defense counsel did not make any comment in response to the position of the State.

. When the jury in this case inquired about allocution, the trial court did not indicate (or even imply) that Smith did not wish to make such a statement. Instead, the court simply advised the jury that “a defendant does not have a right to allocute before a jury without being subject to cross-examination.” This statement would have conveyed to the jury that although Smith may have greatly desired to make a statement to the jury, he felt unable to do so because he would be cross-examined.

. Florida’s voluntary-intoxication statute provides:
775.051. Voluntary intoxication; not a defense; evidence not admissible for certain purposes; exception. Voluntary intoxication resulting from the consumption, injection, or other use of alcohol or other controlled substance as described in chapter 893 is not a defense to any offense proscribed by law. Evidence of a defendant's voluntary intoxication is not admissible to show that the defendant lacked the specific intent to commit an offense and is not admissible to show that the defendant was insane at the time of the offense, except when the consumption, injection, or use of a controlled substance under chapter 893 was pursuant to a lawful prescription issued to the defendant by a practitioner as defined in s.893.02.
§ 775.051, Fla. Stat. (2004).

. Davis committed the murder in 1994, and this aggravator was not enacted until 1995. See ch. 95-159, § 1, Laws of Fla.